195 P.3d 940 (2008)
STATE of Washington, Respondent,
v.
Richard Headen WARREN, Petitioner.
No. 79356-5.
Supreme Court of Washington, En Banc.
Argued November 6, 2007.
Decided November 20, 2008.
*942 Elaine L. Winters, Washington Appellate Project, Seattle, WA, for Petitioner.
Dennis John McCurdy, King County Prosecutor's Office, Seattle, WA, for Respondent.
CHAMBERS, J.
¶ 1 Richard Warren was convicted of one count of first degree child molestation of his eight-year-old stepdaughter, S.S., and, in a separate trial, three counts of second degree child rape of his fourteen-year-old stepdaughter, N.S. In the first trial, Warren was convicted only of offenses relating to S.S., and in the second trial, he was convicted only of offenses relating to N.S.[1] The Court of Appeals affirmed his convictions in a consolidated appeal. We accepted review primarily to consider two issues: whether the prosecutor committed misconduct during closing arguments and whether the State may lawfully prohibit contact between Warren and his wife. We affirm.
¶ 2 The facts surrounding Warren's offenses are ably described by the Court of Appeals.[2] We find it largely unnecessary to review the facts again.

*943 PROSECUTORIAL MISCONDUCT
¶ 3 Warren argues that the prosecutor committed misconduct by repeatedly misstating the burden of proof during closing argument in the first trial. The trial judge overruled Warren's first objection, but after the third time the prosecutor used substantially the same language and Warren made substantially the same objection, the trial judge gave a lengthy curative instruction. During this curative instruction, the trial judge also stated that essentially counsel were "playing with words." Report of Proceedings (RP) (Feb. 20, 2003) at 105. Warren argues that the judge's comment undercuts the seriousness of the misconduct and the effectiveness of the curative instruction. The State properly concedes the prosecutor's language was improper but contends that any error was cured by the trial judge's thorough curative instruction and, in the alternative, that the error was harmless.
¶ 4 The prosecutor's argument was clearly improper and we set forth the pertinent portion of the verbatim report of proceedings for clarity and future guidance. During her rebuttal closing, this exchange occurred:
MS. SNOW [prosecutor]: We also are not clear about the size of the defendant's penis. We have no idea. And for them to ask you to infer everything to the benefit of the defendant is not reasonable.
MR. CARNEY [defense counsel]: Objection, your Honor. Misstates the burden of proof and presumption of innocence.
THE COURT: Counsel, the objection is overruled. Do you want to talk about it? Come here.
(At this time an off-the-record discussion was held.)
THE COURT: Let's move on, Counsel.
MS. SNOW: Reasonable doubt does not mean give the defendant the benefit of the doubt, and that is clear when you read the definition.
Defense counsel calls [S.S.]'s description of what happened a rambling eight-year-old's description. And the bottom line for you is, it has been uncontroverted.
RP (Feb. 20, 2003) at 98-99. The prosecutor continued with an appropriate argument that the jury should not confuse a child's memory with credibility and discussed child testimony concerning penis pumps, pornographic video covers, bathing, and sexual touching. Then the following transpired:
MS. SNOW: Finally, in this case I want to point out that this entire trial has been a search for the truth. And it is not a search for doubt. I talked to you about the fact that you must find the defendant guilty beyond a reasonable doubt. That is the standard to be applied in the defendant's case, the same as any other case. But reasonable doubt does not mean beyond all doubt and it doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt.
MR. CARNEY: Again, your Honor 
THE COURT: Counsel, just a second. There has been an objection to the statements made by the State as to the definition of reasonable doubt. The definition of reasonable doubt is provided in your jury instructions. I don't have the number in front of me, but I think it is the third instruction. I want you to read that instruction very carefully, particularly the last paragraph of the instruction. The second sentence of that reads, "it is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence."
Now, my statement on that is, after you have done that, after you have reviewed all of the evidence or lack of evidence, and you continue to have a reasonable doubt then you must find the defendant not guilty. And if in still having a reasonable doubt that is a benefit to the defendant, then in a sense you are giving the benefit of the doubt to the defendant.
So I don't want you to misconstrue the language that somehow there is no benefit here. Indeed there is, because the benefit of the doubt is if you still have a doubt after having heard all of the evidence and lack of evidence, if you still have a doubt, then the benefit of that doubt goes to the defendant, and the defendant is not guilty.

*944 So we are playing with words here in a sense. The instruction is here in the package. I commend it to you for your reading.
Ultimately you will determine whether, at the conclusion of your deliberations, you have a reasonable doubt or not. You may complete your argument, Counsel.
RP (Feb. 20, 2003) at 104-05.
¶ 5 The prosecutor concluded her closing argument briefly without suggesting, again, that the defendant did not enjoy the benefit of any reasonable doubt. Warren did not seek any additional instructions or a mistrial.
¶ 6 To prevail on a claim of prosecutorial misconduct, a defendant must show first that the prosecutor's comments were improper and second that the comments were prejudicial. See, e.g., State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359, cert. denied, ___ U.S. ___, 128 S.Ct. 2964, ___ L.Ed.2d ___ (2008); State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994).[3] In this case, the prosecutor's argument was improper because it undermined the presumption of innocence. As we have said recently:
The presumption of innocence is the bedrock upon which the criminal justice system stands. . . . The presumption of innocence can be diluted and even washed away if reasonable doubt is defined so as to be illusive or too difficult to achieve. This court, as guardians of all constitutional protections, is vigilant to protect the presumption of innocence.
State v. Bennett, 161 Wash.2d 303, 315-16, 165 P.3d 1241 (2007). Due process requires that the State bear the burden of proving every element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Cantu, 156 Wash.2d 819, 825, 132 P.3d 725 (2006). A defendant is entitled to the benefit of a reasonable doubt. Whether a doubt exists and, if so, whether that doubt is reasonable may be subject to debate in a particular case. However, it is an unassailable principle that the burden is on the State to prove every element and that the defendant is entitled to the benefit of any reasonable doubt. It is error for the State to suggest otherwise.
¶ 7 But this prosecutor did more than merely suggest otherwise. She sought to undermine the State's burden of proof beyond a reasonable doubt. Telling the jury, "it doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt," was simply improper. RP (Feb. 20, 2003) at 104. As a quasi-judicial officer representing the people of the State, a prosecutor has a duty to act impartially in the interest only of justice. See State v. Reed, 102 Wash.2d 140, 147, 684 P.2d 699 (1984). The jury knows that the prosecutor is an officer of the State. It is, therefore, particularly grievous that this officer would so mislead the jury regarding the bedrock principle of the presumption of innocence, the foundation of our criminal justice system.[4]
¶ 8 Here, the prosecutor made the same or similar incorrect statement three times and Warren made prompt objections. The prosecutor's conduct was certainly flagrant. This *945 court's pronouncement of many years ago bears repeating in this instance:
"It is not our purpose to condemn the zeal manifested by the prosecuting attorney in this case. We know that such officers meet with many surprises and disappointments in the discharge of their official duties. They have to deal with all that is selfish and malicious, knavish and criminal, coarse and brutal in human life. But the safeguards which the wisdom of ages has thrown around persons accused of crime cannot be disregarded, and such officers are reminded that a fearless, impartial discharge of public duty, accompanied by a spirit of fairness toward the accused, is the highest commendation they can hope for. Their devotion to duty is not measured, like the prowess of the savage, by the number of their victims."
State v. Charlton, 90 Wash.2d 657, 665, 585 P.2d 142 (1978) (quoting State v. Montgomery, 56 Wash. 443, 447-48, 105 P. 1035 (1909)).
¶ 9 In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. Yates, 161 Wash.2d at 774, 168 P.3d 359. Had the trial judge not intervened to give an appropriate and effective curative instruction, we would not hesitate to conclude that such a remarkable misstatement of the law by a prosecutor constitutes reversible error. However, reviewing the argument in context, because Judge Hayden interrupted the prosecutor's argument to give a correct and thorough curative instruction, we find that any error was cured. We presume the jury was able to follow the court's instruction. See State v. Smith, 144 Wash.2d 665, 679, 30 P.3d 1245, 39 P.3d 294 (2001) (some improper prosecutorial remarks may touch upon constitutional rights but are still curable by a proper instruction); State v. Stenson, 132 Wash.2d 668, 730, 940 P.2d 1239 (1997). Warren has not shown that he was prejudiced by the prosecutor's improper argument in the first trial.[5]
¶ 10 Warren also argues that the prosecutor's conduct was improper in his second trial in which he was convicted of offenses against N.S. The State concedes the closing argument was improper insofar as it referred to facts not in evidence. In explaining why N.S. did not report her stepfather's abuse, which had continued for several years, the prosecutor argued that children assess very carefully who they will disclose sexual abuse to and that long delays are common because people frequently repress sexual abuse. No evidence supporting that argument had been offered to the jury. Warren did not object but argues an objection would have been futile because the court had previously made clear it would not hear objections based on mischaracterizing the evidence.[6] But the jury is presumed to follow the instruction *946 that counsel's arguments are not evidence. Stenson, 132 Wash.2d at 729-30, 940 P.2d 1239; State v. Grisby, 97 Wash.2d 493, 499, 647 P.2d 6 (1982). Given the weight of the properly admitted evidence against Warren, he has failed to show that he was prejudiced by the prosecutor's comments. See Russell, 125 Wash.2d at 85, 882 P.2d 747.
¶ 11 Warren also argues, and the State properly concedes, it was improper for the prosecutor to tell the jury there were a "number of mischaracterizations" in defense counsel's argument as "an example of what people go through in a criminal justice system when they deal with defense attorneys." RP (Nov. 18, 2003) at 62-63. The prosecutor also described defense counsel's argument as a "classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing." Id. While the prosecutor's comments were improper because they commented on defense counsel's role, Warren did not object at the time to these comments, and they are not so flagrant and ill-intentioned that no instruction could have cured them. See Stenson, 132 Wash.2d at 719, 940 P.2d 1239; State v. Gonzales, 111 Wash.App. 276, 45 P.3d 205 (2002) (misconduct to directly contrast prosecutor's role with defense attorney's role). As in Yates, Warren has failed to show prejudice. See Yates, 161 Wash.2d at 776, 168 P.3d 359 (even if prosecutor's argument improperly commented on defense counsel's role, there was no substantial likelihood the comment affected the jury's decision).
¶ 12 Next, Warren argues that the prosecutor's "badge of truth" theme during closing argument amounted to misconduct. The prosecutor argued the details in N.S.'s testimony gave it a "badge of truth" and the "ring of truth." RP (Nov. 18, 2003) at 12. The prosecutor then went over specific parts of N.S.'s testimony that "rang out clearly with truth in it." Id. at 13. Warren did not object. It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995).
¶ 13 But defense counsel clearly attacked N.S.'s credibility during opening statements and cross examination. The prosecutor responded by arguing that the level of detail in N.S.'s testimony raises a reasonable inference that she was telling the truth. For example, N.S. testified that Warren would withdraw before ejaculating during intercourse and that she had difficulty swallowing Warren's ejaculate during oral sex and sometimes would spit it into a sink. The prosecutor argued that these statements had a "ring of truth" and the detail was not the kind one would expect a 14-year-old to know absent abuse. These arguments were not improper. First, there was no explicit statement of personal opinion. Id. (prejudicial error will not be found unless it is clear and unmistakable that counsel is expressing a personal opinion). Second, prosecutors have wide latitude to argue reasonable inferences from the facts concerning witness credibility. Stenson, 132 Wash.2d at 727, 940 P.2d 1239. Therefore, this argument was not improper.
¶ 14 Finally, Warren argues the prosecutor's closing argument in the second trial was misconduct because the State's interpretation of certain lyrics in the rap song Warren wrote while in jail on these charges was different from the interpretation argued in the first trial. We reject this claim because even if the prosecutor's interpretation was different at the first and second trials, the song was admitted only to impeach Warren's characterization of himself as a caring stepparent. This does not amount to the prosecutor arguing inconsistent theories of liability. See State v. Roberts, 142 Wash.2d 471, 498, 14 P.3d 713 (2000).
¶ 15 While we find that the prosecutor made several improper arguments, Warren has not established prejudice.

NO CONTACT CONDITION OF SENTENCING
¶ 16 As a condition of his sentence, Warren was prohibited from having contact with his wife, Lisa Warren, for life. He argues that this prohibition is unauthorized by statute and violates his constitutional marriage *947 rights. We will briefly review the salient facts.
¶ 17 Warren moved in with his then-girlfriend Lisa[7] and her two daughters, N.S. and S.S., around January 2001, and the couple married several months later. By the following spring, Lisa was pregnant with Warren's child. During an argument in March 2002, Warren assaulted Lisa. He pleaded guilty to domestic violence and went to jail.
¶ 18 It was in June 2002 that allegations of child molestation first surfaced. Eight-year-old S.S. told a school counselor she was upset that her stepfather was being released from jail because he did disgusting things to her. After S.S. described two recent incidents in great detail, Warren was charged with first degree rape of a child and first degree child molestation. At first Lisa stood by Warren but when her other daughter, N.S., disclosed that she had been abused as well, Lisa began to cooperate with the State, ultimately testifying against Warren. As a condition of his sentence, the court prohibited Warren from contacting S.S., N.S., and their mother Lisa. He was not prohibited from contacting his own biological child.
¶ 19 The trial court imposed the no-contact order because Lisa's children were the victims of the crimes and because she testified against Warren at his first trial. The court cited Warren's controlling behavior in general, including the fact that Lisa took the children out of school and avoided subpoenas at Warren's urging.
¶ 20 The Sentencing Reform Act of 1981(Act), RCW 9.94A.505(8), authorizes the trial court to impose "crime-related prohibitions."
¶ 21 Under the Act, trial courts may impose crime-related prohibitions for a term of the maximum sentence to a crime, independent of conditions of community custody. State v. Armendariz, 160 Wash.2d 106, 112, 120, 156 P.3d 201 (2007). "Crime-related prohibitions" are orders directly related to "the circumstances of the crime." RCW 9.94A.030(13). This court reviews sentencing conditions for abuse of discretion. State v. Riley, 121 Wash.2d 22, 37, 846 P.2d 1365 (1993). Such conditions are usually upheld if reasonably crime related. Id. at 36-37, 846 P.2d 1365.
¶ 22 More careful review of sentencing conditions is required where those conditions interfere with a fundamental constitutional right. See State v. Riles, 135 Wash.2d 326, 347, 957 P.2d 655 (1998). Conditions that interfere with fundamental rights must be reasonably necessary to accomplish the essential needs of the State and public order. Id. Additionally, conditions that interfere with fundamental rights must be sensitively imposed. Riley, 121 Wash.2d at 37, 846 P.2d 1365 (citing United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 (9th Cir. 1975)).
¶ 23 Whether a condition of sentence prohibiting contact with a spouse who is not the direct victim of the crime is reasonably crime related or violates the fundamental right to marriage are questions of first impression in Washington.[8] However, the Court of Appeals *948 considered similar issues in State v. Ancira, 107 Wash.App. 650, 27 P.3d 1246 (2001). The order at issue in that case prohibited all contact between the defendant and his children, although he was convicted only of domestic violence against his wife. Id. at 654, 27 P.3d 1246. The court held that the order prohibiting contact with the children violated Ancira's fundamental right to parent his children because cutting off all contact was not reasonably necessary to protect them from the harm of witnessing domestic violence. Id.
¶ 24 Warren first argues that the no-contact order was not reasonably crime related because Lisa was not the victim of the crimes. While this is admittedly a close question, we conclude that the trial court did not abuse its discretion. Warren is correct that Washington courts have been reluctant to uphold no-contact orders with classes of persons different from the victim of the crime. See Riles, 135 Wash.2d at 349, 957 P.2d 655 (no-contact order with minors was not related to crime of rape of adult woman); Ancira, 107 Wash.App. at 656, 27 P.3d 1246 (no contact order with children not necessary when defendant convicted of domestic violence against wife). But unlike the protected parties in the cases cited above, protecting Lisa is directly related to the crimes in this case. She is the mother of the two child victims of sexual abuse for which Warren was convicted; Warren attempted to induce her not to cooperate in the prosecution of the crime; and Lisa testified against Warren resulting in his conviction of the crime. Warren's criminal history includes convictions for murder and for beating Lisa. There is nothing in the record to suggest that Lisa objects to the no-contact order.[9] Thus, we conclude that protecting Lisa was reasonably related to the crime.
¶ 25 Warren also argues the no-contact order violates his fundamental constitutional right to marriage and to parent his children. The rights to marriage and to the care, custody, and companionship of one's children are fundamental constitutional rights, and state interference with those rights is subject to strict scrutiny. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Although Warren's ability to engage in marital activity is necessarily limited by his imprisonment and the no-contact orders with N.S. and S.S., there remain certain aspects of marriage which may not be denied absent a compelling state interest. See Turner v. Safley, 482 U.S. 78, 95-96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (married inmate still entitled to benefits of marriage such as emotional support, spiritual commitment, eligibility for government benefits, and inheritance and property rights).
¶ 26 We conclude the order prohibiting contact does not violate Warren's fundamental right to marry because it is reasonably necessary to achieve a compelling state interest, namely, the protection of Lisa and her daughters. We are mindful that crime-related prohibitions affecting fundamental rights must be narrowly drawn. Riley, 121 Wash.2d at 38, 846 P.2d 1365 (citing Consuelo-Gonzalez, 521 F.2d at 265). There must be no reasonable alternative way to achieve the State's interest. See Ancira, 107 Wash. App. at 655, 27 P.3d 1246.
¶ 27 In Ancira, the court struck down the no-contact order because the children could be protected through indirect contact by phone or mail, or supervised visitation outside the presence of their mother (who was the victim of the domestic violence at issue). Id. Thus, it was not reasonably necessary to cut off all contact with the children. Id. Here, by contrast, preventing all contact appears reasonably necessary to protect Lisa. Under these unique facts, we agree with the Court of Appeals that the order prohibiting contact with Lisa was directly related to the circumstances of the crime and was not an *949 unconstitutional restriction on Warren's constitutional rights.
¶ 28 We also agree with the Court of Appeals that the remaining alleged errors do not warrant reversal. We first note that Warren's argument that witnesses' descriptions of their interviews with S.S. and N.S. constituted improper vouching was recently settled by this court in State v. Kirkman, 159 Wash.2d 918, 934-37, 155 P.3d 125 (2007) (description of interview protocol of asking child to tell the truth and eliciting promise to do so is not improper vouching). We agree with the Court of Appeals that the evidence of Warren's charges and conviction for child molestation from the first trial was within the trial court's discretion to admit in the second trial under ER 404(b) and ER 609. See State v. Elmore, 139 Wash.2d 250, 285-87, 985 P.2d 289 (1999) (discussing res gestae exception to ER 404(b)); State v. Renneberg, 83 Wash.2d 735, 738, 522 P.2d 835 (1974) (discussing open door doctrine). Evidence of a sexual device found by S.S. was also within the trial court's discretion to admit. See State v. DeVincentis, 150 Wash.2d 11, 22, 74 P.3d 119 (2003) (discussing evidence of grooming behaviors in child sexual abuse case). Since we find no improperly admitted evidence, Warren's claim of cumulative error fails.

CONCLUSION
¶ 29 While we find the prosecutor's comments were improper, Warren has not established prejudice. We find the no-contact order did not infringe on Warren's constitutionally protected marriage rights. None of Warren's other arguments merit reversal. We affirm.
WE CONCUR: SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, Justices, and BOBBE J. BRIDGE, J. Pro Tem.
SANDERS, J. (dissenting).
¶ 30 According to the majority the numerous instances of conceded prosecutorial misconduct in Richard Warren's second and fourth trials are not reversible error.[1] I disagree; I conclude the prosecutorial misconduct in Warren's second trial and the accumulation of errors in Warren's fourth trial require reversal of both verdicts. Last, I would hold prohibiting Warren from communicating with his wife was not reasonably related to his convictions and violates his fundamental right to marriage.

I. THE PROSECUTORIAL MISCONDUCT AT WARREN'S SECOND TRIAL
¶ 31 Normally, prosecutorial misconduct is grounds for reversal where there is a substantial likelihood the misconduct affected the verdict. State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995). However, when the prosecutor's misconduct affects a constitutional right, such as the right against self-incrimination, the court undertakes a separate analysis: the constitutional harmless error analysis. See State v. Easter, 130 Wash.2d 228, 242-43, 922 P.2d 1285 (1996); State v. Davenport, 100 Wash.2d 757, 761-62, 675 P.2d 1213 (1984). Under this review the error is harmless if the court is convinced beyond a reasonable doubt that the jury would have reached the same result. Easter, 130 Wash.2d at 242, 922 P.2d 1285.
¶ 32 According to Davenport, 100 Wash.2d at 761, 675 P.2d 1213, constitutional harmless error analysis is inappropriate for cases involving mere "trial irregularities." "Such irregularities neither independently violate a defendant's constitutional rights . . . nor violate a statute or Rule of Evidence. . . ." Id. at 761 n. 1, 675 P.2d 1213 (citations omitted). But here, the prosecutorial misconduct directly and independently infringed on the "bedrock" of our criminal justice system: the presumption of innocence. State v. Bennett, 161 Wash.2d 303, 315, 165 P.3d 1241 (2007). Moreover, the prosecutorial misconduct violated RCW 10.58.020, providing, "[e]very person charged with the commission of a crime shall be presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt. . . ." As such, the constitutional harmless error analysis applies, and *950 the court must be convinced beyond a reasonable doubt that the jury would have reached the same result. Easter, 130 Wash.2d at 242, 922 P.2d 1285; see also State v. Fleming, 83 Wash.App. 209, 216, 921 P.2d 1076 (1996) (utilizing constitutional harmless error analysis where prosecutor improperly shifted the burden of proof, misstated the nature of reasonable doubt and the role of the jury, and infringed on the defendant's right to remain silent).
¶ 33 In Warren's second trial the prosecutor argued in closing it was not reasonable for the jury "to infer everything for the benefit of the defendant. . . ." Report of Proceedings (RP) (Feb. 20, 2003) at 98. Warren objected, but the trial court overruled his objection. Afterward the prosecutor reprised her erroneous interpretation of the burden of proof: "[r]easonable doubt does not mean give the defendant the benefit of the doubt. . . ." RP at 99. Later the prosecutor repeated her argument that "reasonable doubt does not mean beyond all doubt. It doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt." RP at 104. Warren again objected and without ruling on the objection, the court instructed the jury in relevant part:
[A]fter you have reviewed all of the evidence or lack of evidence, and you continue to have a reasonable doubt then you must find the defendant not guilty. And if in still having a reasonable doubt that is a benefit to the defendant, then in a sense you are giving the benefit of the doubt to the defendant.
So I don't want you to misconstrue the language that somehow there is no benefit here. Indeed there is, because the benefit of the doubt is if you still have a doubt after having heard all of the evidence or lack of evidence, if you still have a doubt, then the benefit of that doubt goes to the defendant, and the defendant is not guilty.
So we are playing with words here in a sense.
RP at 104-05.[2]
¶ 34 The State concedes the prosecutor mischaracterized the presumption of innocence and the burden of proof. The State argues, however, the jury was not misled by the prosecutor's repeated mischaracterization because of the court's curative instruction. I cannot agree.
¶ 35 The trial court overruled Warren's first objection to the prosecutor's clear mischaracterization, implicitly bolstering the mischaracterization. The trial court passed on Warren's second objection, giving a curative instruction instead. Yet, the trial court's instruction undermined its curative effect by implying the issue was merely a semantic quibble as opposed to the foundation of our criminal justice system. Moreover, given the repeated and flagrant misconduct involved here, such a tepid instruction was unlikely to cure the obvious prejudice involved in mischaracterizing the presumption of innocence. See State v. Copeland, 130 Wash.2d 244, 284, 922 P.2d 1304 (1996) (internal quotation marks omitted) ("`If misconduct is so flagrant that no instruction can cure it, there is, in effect, a mistrial and a new trial is the only and the mandatory remedy.'") (quoting State v. Belgarde, 110 Wash.2d 504, 508, 755 P.2d 174 (1988)).
¶ 36 In the final analysis a jury is "made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors." State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946). I am not convinced beyond a reasonable doubt the jury would have reached the same result had the prosecutor not mischaracterized the presumption of innocence and its high burden of persuasion.

II. THE CUMULATIVE ERROR AT WARREN'S FOURTH TRIAL
¶ 37 Whether the prejudicial effect of an individual instance of error independently requires reversal, the cumulative effect of numerous errors may be such that reversal is *951 required. See State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984) (reversal required because of accumulated evidentiary errors and prosecutorial misconduct). After analyzing the prosecutorial misconduct from Warren's fourth trial, I would hold the cumulative error requires reversal.
¶ 38 As stated above, when alleged prosecutorial misconduct does not directly infringe a constitutional right, the defendant must establish the prosecutor's improper conduct and its prejudicial effect. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003) (citing Pirtle, 127 Wash.2d at 672, 904 P.2d 245, and State v. Furman, 122 Wash.2d 440, 455, 858 P.2d 1092 (1993)). The court evaluates the conduct in light of the total argument, issues, evidence, and jury instructions. State v. Davis, 141 Wash.2d 798, 872, 10 P.3d 977 (2000).
¶ 39 Normally, where the defendant fails to object to the prosecutor's allegedly improper conduct, the defendant waives any resultant error unless the conduct is "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997). Reversal is also not required if the prejudice could have been cured by a jury instruction, which the defendant did not request. State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994).
¶ 40 Here, however, the trial judge rendered futile any objection based on factual mischaracterizations during closing arguments. Therefore, we should analyze the prosecutor's conduct and defense counsel's failure to object with this limitation in mind. The prosecutor committed three instances of misconduct.
¶ 41 First, the prosecutor improperly vouched for the testimony of the victim witness, stating the testimony had the "badge of truth" and "the ring of truth." RP (Nov. 18, 2003) at 12. "It is improper for a prosecutor personally to vouch for the credibility of a witness." State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995) (citing State v. Sargent, 40 Wash.App. 340, 344, 698 P.2d 598 (1985)); see also RPC 3.4(e). A prosecutor may argue reasonable inferences from the evidence, but a prosecutor may not make a "`clear and unmistakable'" expression of personal opinion. Brett, 126 Wash.2d at 175, 892 P.2d 29 (quoting Sargent, 40 Wash.App. at 344, 698 P.2d 598).
¶ 42 The State argues the prosecutor was merely drawing reasonable inferences from the testimony. The prosecutor's hyperbole, however, went beyond drawing reasonable inferences from the testimony; the prosecutor's statements were a clear expression of opinion. It is one thing to emphasize the reliability of one witness over another; it is something else to state a personal belief that a witness told the truth.
¶ 43 Second, the prosecutor improperly argued facts not in evidence, discussing "the phenomenon of delayed disclosure" of sexual abuse. RP (Nov. 18, 2003) at 9. This line of argument would have been proper had the State offered some expert testimony on the claimed phenomenon of delayed reporting of sexual abuse. But as it was, the prosecutor impermissibly argued prejudicial facts not in the record, permitting the jury to speculate on facts not before it. See State v. Rose, 62 Wash.2d 309, 312, 382 P.2d 513 (1963); see also Belgarde, 110 Wash.2d at 508, 755 P.2d 174 ("A prosecutor has no right to call to the attention of the jury matters or considerations which the jurors have no right to consider.").
¶ 44 Last, in rebuttal the prosecutor disparaged Warren's counsel by arguing Warren's counsel mischaracterized the facts. Disparaging counsel is clearly misconduct. See State v. Reed, 102 Wash.2d 140, 146-47, 684 P.2d 699 (1984).
¶ 45 The State concedes the prosecutor committed misconduct by arguing facts not in evidence and disparaging defense counsel; yet the majority does not perceive reversible error. See majority at 946. The jury was left with the impression it should not disbelieve the victim-witness despite her delay in reporting the incident, and it should not believe defense counsel. "While it is possible that some of these errors, standing alone, might not be of sufficient gravity to constitute grounds for a new trial, the combined effect of the accumulation of errors most certainly *952 requires a new trial." Coe, 101 Wash.2d at 789, 684 P.2d 668.

III. THE NO CONTACT ORDER
¶ 46 Imposing a no contact order, precluding Warren from communicating with his wife is inconsistent with the clear language of the statute. See RCW 9.94A.505(8); 9.94A.030(13); RCW 9.94A.700(5)(b); see also State v. Riles, 135 Wash.2d 326, 957 P.2d 655 (1998). Moreover, the blanket no contact order impermissibly violates Warren's fundamental right to marriage. Riles, 135 Wash.2d at 350, 957 P.2d 655 (observing offender limitation on fundamental right is only permitted if "reasonably necessary to accomplish the essential needs of the state and the public order") (citing State v. Ross, 129 Wash.2d 279, 287, 916 P.2d 405 (1996) and State v. Riley, 121 Wash.2d 22, 37-38, 846 P.2d 1365 (1993)).

A. The no contact order is not statutorily authorized
¶ 47 Under RCW 9.94A.505(8) the sentencing court may impose crime-related prohibitions. A "[c]rime-related prohibition" is an order "that directly relates to the circumstances of the crime." RCW 9.94A.030(13); see also RCW 9.94A.700(5)(b) (authorizing, as a condition of community custody, no "direct or indirect contact with the victim of the crime or a specified class of individuals").
¶ 48 Therefore, the statute authorizes conduct prohibitions directly related to the facts of the adjudicated offense. "The philosophy underlying the `crime-related' provision is that `[p]ersons may be punished for their crimes and they may be prohibited from doing things which are directly related to their crimes, but they may not be coerced into doing things which are believed will rehabilitate them.'" Riley, 121 Wash.2d at 36-37, 846 P.2d 1365 (alternation in original) (quoting David Boerner, Sentencing in Washington § 4.5, at 4-7 (1985)).
¶ 49 For example, in Riles, 135 Wash.2d at 349, 957 P.2d 655 the petitioner was convicted of raping a 19-year-old woman, but the trial court ordered him not to have contact with any minor-aged children. To strike the order prohibiting contact with all minor-aged children the court reasoned,
[i]t would be logical for a sex offender who victimizes a child to be prohibited from contact with that child, as well as from contact with other children. It is not reasonable, though, to order even a sex offender not to have contact with a class of individuals who share no relationship to the offender's crime.
Id. at 350, 957 P.2d 655. Such force of logic applies equally here.
¶ 50 Warren's wife was not the victim of Warren's crime. Warren's wife does not belong to the class of individuals related to Warren's crime. Warren's wife has not even indicated a desire for a no contact order. In fact, Warren's wife originally did not want to cooperate in Warren's prosecution. Thus, the sentencing court was not authorized to prohibit Warren from contacting his wife.

B. The no contact order impermissibly infringes on the fundamental right to marriage
¶ 51 People have a fundamental right to enter into and maintain a marriage relationship. See, e.g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The fact of incarceration does not eliminate this fundamental right. See Turner v. Safley, 482 U.S. 78, 95-96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). To the contrary, for prisoners the "expression[ ] of emotional support and public commitment. . . . are an important and significant aspect of the marital relationship." Id.
¶ 52 Concomitantly, while a convicted defendant's rights are subject to some restriction as a result of a criminal conviction, such restriction may be only "to the extent it is reasonably necessary to accomplish the essential needs of the state and the public order." Riles, 135 Wash.2d at 350, 957 P.2d 655. Courts have upheld this principle in other contexts.
¶ 53 For example in State v. Letourneau, 100 Wash.App. 424, 997 P.2d 436 (2000), the defendant was convicted of second degree rape of a child, and part of her sentence prohibited unsupervised in-person contact *953 with her minor children. The Court of Appeals held the condition prohibiting unsupervised contact with her minor children was not reasonably necessary to prevent her from sexually molesting them because there was no evidence that she was a pedophile or posed a danger to her children. Id. at 442, 997 P.2d 436.
¶ 54 Similarly in State v. Ancira 107 Wash. App. 650, 652-53, 27 P.3d 1246 (2001), the defendant was prohibited from contacting his children because they were present when the defendant violated a no contact order protecting his wife and previously witnessed violence between the parents. The Court of Appeals determined that while limitations on contact with the children might have been appropriate, the complete prohibition was "extreme and unreasonable given the fundamental rights involved." Id. at 655, 27 P.3d 1246. The evidence did not show the no contact order was reasonably necessary to protect the children. Id. at 654-55, 27 P.3d 1246. Consequently, the court held the prohibition "was not reasonably necessary to meet the State's legitimate objectives." Id. at 652, 27 P.3d 1246.
¶ 55 The unique facts of this case, however, present a question of first impression: Whether the State may prohibit a convicted criminal defendant from contacting his or her spouse if the spouse is not the victim of defendant's crime, but the parent of the victim. Some sister jurisdictions have addressed a similar question. See State v. Martin, 282 Or. 583, 580 P.2d 536 (1978); Dawson v. State, 894 P.2d 672 (Alaska Ct.App.1995).
¶ 56 In Martin, the trial court imposed as a condition of defendant's probation an absolute prohibition against association with any person who had ever been convicted of a crime, including defendant's husband. The Oregon Supreme Court modified the condition, holding before a person may be prohibited from contacting his or her spouse as a condition of a criminal sentence, the sentencing court must "consider whether a lesser interference with defendant's marriage would serve to rehabilitate the defendant and secure the safety of society." Martin, 282 Or. at 589-90, 580 P.2d 536 (footnote omitted).
¶ 57 In Dawson, 894 P.2d 672, the defendant was convicted of trafficking cocaine, and as part of his sentence the court ordered the defendant have no unsupervised contact with his wife, believing the no contact order necessary because the wife was equally involved in cocaine trafficking. The sentencing court, however, had no information as to the wife's substance abuse problem or possible rehabilitation. Id. at 680. Vacating the no contact order, the Alaska Court of Appeals reasoned, "[w]hile discouraging a probationer from associating with former partners in crime is obviously related to the goal of rehabilitation, precluding association between marital partners is just as obviously an extreme restriction of liberty, even when the marital partners were once partners in crime." Id. As such, "to avoid unnecessary intrusion on marital privacy, it would seem appropriate to tailor a close fit between the scope of the order restricting marital association and the specific needs of the case at hand." Id. at 681.
¶ 58 For example in People v. Jungers, 127 Cal.App.4th 698, 25 Cal.Rptr.3d 873 (2005), the defendant was convicted of felony domestic violence, and the court imposed a limited no contact order as a condition of probation. To uphold the order, the California Court of Appeals reasoned the order "did not impose a complete ban on association or marital privacy," but instead only prohibited the defendant from initiating contact with his wife, permitting visits, conversations, and communications initiated by her. Id. at 705, 25 Cal.Rptr.3d 873; see also Commonwealth v. LaPointe, 435 Mass. 455, 459, 759 N.E.2d 294 (2001) ("In cases where a condition touches on constitutional rights, the goals of probation 'are best served if the conditions of probation are tailored to address the particular characteristics of the defendant and the crime.'" (quoting Commonwealth v. Pike, 428 Mass. 393, 403, 701 N.E.2d 951 (1998))).
¶ 59 These cases teach us that before a court imposes a complete prohibition on the exercise of the marital right, it should make an inquiry into whether the prohibition is actually necessary to further the State's probation goals. In addition, the court should consider whether a less restrictive alternative *954 condition could serve the same purpose with less infringement on the marital right. Such an inquiry serves two purposes. First, it preserves the record for appropriate appellate review. Second, it ensures any limitation on a fundamental right is "imposed sensitively." Riley, 121 Wash.2d at 37, 846 P.2d 1365.
¶ 60 Here, the trial court made no apparent effort to tailor the scope of the no contact order or consider less restrictive alternatives. Instead Warren was completely prohibited from communicating with his wife. Yet, there is no evidence such an order was actually necessary to further the goal of rehabilitating Warren or protecting the public. The majority speculates the no contact order was necessary to protect Mrs. Warren from Warren's retribution. Majority at 948-49. Yet nothing in the record suggests Mrs. Warren desires no contact with Warren. The sentencing court apparently considered an e-mail purportedly from Mrs. Warren; however, that e-mail was not made part of the record. Before a person's fundamental liberty may be infringed, the State must allege more than speculation. See Riles, 135 Wash.2d at 350, 957 P.2d 655. I would strike the no contact order prohibiting Warren from communicating with his wife.

IV. CONCLUSION
¶ 61 Based on the prosecutorial misconduct and erroneous instruction in Warren's second trial, his conviction should be reversed. Based on the cumulative error in Warren's fourth trial, his convictions should be reversed. Lastly, I would strike Warren's no contact order prohibiting all communication with Mrs. Warren.
¶ 62 The majority holds otherwise, so I dissent.
ALEXANDER, C.J. (concurrence, in part, with dissent).
¶ 63 I agree with Justice Sanders that the prosecutor engaged in misconduct at the trial at which Richard Warren was convicted of molesting his eight-year-old stepdaughter, S.S. I also agree that the misconduct cannot be considered harmless. Warren's conviction on this charge should, therefore, be reversed. I reach this conclusion because of the prosecutor's frequent and flagrant misstatement of the burden of proof. The principle that a defendant is presumed to be innocent throughout the trial and that the burden resides with the State to overcome that presumption by evidence that is convincing beyond a reasonable doubt is, as Justice Sanders points out, a "`bedrock'" upon which our criminal justice stands. Dissent at 949 (quoting State v. Bennett, 161 Wash.2d 303, 315, 165 P.3d 1241 (2007)). For the prosecutor to have asserted on three occasions during the trial that the State's burden should be reduced was highly prejudicial to Warren. Although the trial judge endeavored to cure the error with an instruction to the jury, the impact of the instruction was, unfortunately, diluted by the trial judge's statement that "`we are playing with words here.'" Id. at 950 (quoting Report of Proceedings (Feb. 20, 2003) at 105). In sum, I conclude that under either a constitutional or nonconstitutional harmless error analysis, the misconduct was so significant that the error was not cured by the watered down jury instruction given by the trial judge.
¶ 64 Insofar as Warren's conviction, at a second trial, on three charges of raping his stepdaughter, N.S., I concur with the majority's affirmance of these convictions. Although, as the majority concedes, the prosecutor made several improper arguments at this trial as well, I do not believe that the cumulative effect of this misconduct was sufficient to justify reversal.
¶ 65 I also agree with the majority that the trial court did not err in prohibiting Warren from having contact with his wife. The no-contact provision is, in my view, a crime related prohibition and one that was not objected to by Warren's wife, Lisa. It cannot, in my judgment, be said that the condition is unlawful or unreasonable.
MADSEN, J. (concurrence, in part, in dissent).
¶ 66 The majority affirms Richard Warren's conviction in his second trial[1] for first *955 degree child molestation, in part, by stating that the prejudice Warren suffered when the prosecution misstated its burden of proof was cured by the trial court's instruction to the jury on the reasonable doubt standard. Majority at 945. I cannot agree that the violation of a right so fundamental as the presumption of innocence can be cured by the instruction given to the jury in this case. In my opinion, the "curative instruction" also misconstrued the reasonable doubt standard and in doing so, irrevocably prejudiced the defendant. I would follow the analysis set forth by the Supreme Court in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), to hold that such an erroneous instruction from the court can never be harmless and instead requires reversal.
¶ 67 The prosecutor in Warren's case mischaracterized the burden of proof three separate times; each time Warren promptly objected. After overruling Warren's first objection to the prosecutor's mischaracterizations, the trial court finally intervened when the prosecutor asserted that "reasonable doubt does not mean . . . that you give the defendant the benefit of the doubt." Report of Proceedings (RP) (Feb. 20, 2003) at 104. Upon objection to this statement, the trial court referred the jury to the written instruction on the reasonable doubt standard and gave further verbal instruction. The trial court concluded its verbal instruction on reasonable doubt by stating, "[s]o we are playing with words here in a sense."[2]Id. at 105. This statement to the jury paints the reasonable doubt standard as a game of semantics, mere words to be played with by the defense and the prosecution. Our system of justice and the defendant's Sixth Amendment right to trial by jury and a presumption of innocence is not a game of words. As the majority notes, "`[t]he presumption of innocence is the bedrock upon which the criminal justice system stands.'" Majority at 944 (quoting State v. Bennett, 161 Wash.2d 303, 315-16, 165 P.3d 1241 (2007)).
¶ 68 I agree with the dissent that Warren's constitutional right to a presumption of innocence was violated. See dissent at 949 ("[T]he prosecutorial misconduct directly and independently infringed on the `bedrock' of our criminal justice system: the presumption of innocence."). I disagree, however, that the violation of that right can be subjected to the constitutional harmless error doctrine. See id. at 949. The erroneous instruction in Warren's case came from the judge, not the prosecutor. This falls squarely within the Supreme Court's holding in Sullivan that "harmless-error analysis cannot be applied in the case of a defective reasonable-doubt instruction consistent with the Sixth Amendment's jury-trial guarantee." Sullivan, 508 U.S. at 285, 113 S.Ct. 2078 (Rehnquist, C.J., concurring).
¶ 69 The Seventh Circuit has rejected arguments that the automatic reversal standard set out in Sullivan should also apply to prosecutorial comments misconstruing the burden of proof. Bartlett v. Battaglia, 453 F.3d 796, 801 (7th Cir.2006) ("While we strongly disapprove of the prosecution's clumsy attempts to discuss the burden of proof, these comments simply could not have poisoned the jury's understanding in the same manner an erroneous jury instruction would have."). However, as noted above, in Warren's case the erroneous statement of the burden of proof requiring reversal of his conviction came from the judge's instructions to the jury, not from the prosecutor's arguments.[3]
¶ 70 As to Warren's fourth trial, I cannot agree with the majority that the prosecutor's use of the phrases "badge of truth" and "ring of truth" to describe the victim's testimony *956 was proper. However, as Warren did not object, I find that these comments were not so flagrant and ill-intentioned that no instruction could have cured them. See State v. Hoffman, 116 Wash.2d 51, 93, 804 P.2d 577 (1991). And, though there were other errors in Warren's fourth trial, I would not go so far as the dissent to say that, taken cumulatively, these errors warrant reversal of that conviction.
¶ 71 Finally, I agree with the majority and Justice Alexander that the trial court did not err in prohibiting Warren from having contact with his wife.
I CONCUR: CHARLES W. JOHNSON, Justice.
NOTES
[1] This case has involved four trials. Warren's first trial ended in a mistrial. In the second trial, he was convicted of molesting S.S., but the jury was unable to reach a verdict on the charges relating to N.S. The third trial again resulted in a mistrial. At a fourth trial, Warren was convicted of raping of N.S. For purposes of this opinion, we disregard the two mistrials and refer to the first trial at which there was a conviction as the first trial, and the second at which there was a conviction as the second trial.
[2] State v. Warren, 134 Wash.App. 44, 138 P.3d 1081 (2006).
[3] This has long been our approach to analyzing prosecutorial misconduct. See, e.g., Yates, 161 Wash.2d at 774, 168 P.3d 359; Russell, 125 Wash.2d at 85, 882 P.2d 747. Warren urges us to apply instead a constitutional harmless error analysis because the misconduct in this case touches on constitutional rights. Perhaps if a prosecutor violated an accused's right of silence by improperly blurting out the accused had exercised his constitutional right, the constitutional harmless error standard would be appropriate. But Warren's jury was properly instructed on the presumption of innocence. Before us is trial counsel's argument over the application of the instructions and the trial judge's prompt intervention with a curative instruction. We decline to reach the issue of whether a constitutional error analysis might be appropriate if the prosecutorial misconduct directly violated a constitutional right.
[4] We take judicial notice that, indeed, the same prosecutor made similar arguments before. In State v. Wells, noted at 118 Wash.App. 1061, 2003 WL 22286178, the very same prosecutor made the very same "benefit of the doubt" argument; however, the defendant neither objected nor sought a curative instruction. The Court of Appeals held the remark was "entirely inappropriate," but the defendant waived the misconduct because the remark was not so flagrant and ill-intentioned that it could not have been obviated by a curative instruction. Id.
[5] We respectfully disagree with our dissenting colleagues that Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) applies to this case. In Sullivan, the written reasonable doubt instruction given to the jury was flatly incorrect. The Supreme Court unanimously concluded that this was a structural error that deprived the defendant of a fair trial. Id. at 278, 113 S.Ct. 2078. Warren does not challenge the written instructions given to the jury. The real instructional issue is whether the trial judge's unfortunate statement that "we are playing with words here in a sense" so undermined the correct instruction as to constitute reversible error. Like most errors, even constitutional ones, it is subject to some sort of harmless error analysis. See Neder v. United States, 527 U.S. 1, 7-8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (misstatement of elements subject to harmless error analysis). Accord Bartlett v. Battaglia, 453 F.3d 796, 801 (7th Cir.2006) (declining to extend Sullivan's structural error analysis to prosecutorial argument misstating the burden of proof).

We are also not persuaded that anything that falls from a judge's lips during a trial is an instruction to the jury. Warren does not ask that we evaluate the judge's comment that counsel was playing with words as an instruction. Instead he argues-appropriately  that it is relevant to whether the prosecution's misstatement of the law was prejudicial to his case.
[6] The judge had responded to an earlier objection as follows: "Members of the jury, as I have instructed you, and I have obviously instructed both counsel, what counsel say is not evidence. So the objection is overruled because it is up to the jury to decide what the evidence is. If counsel misstates the evidence I'm sure you will correct it in the jury room. An objection to mischaracterizing the evidence during closing argument is not a well founded objection." RP (Nov. 18, 2003) at 44; see also RP (Feb. 20, 2003) at 7-8, 94-95.
[7] To avoid confusion, Lisa Warren is referred to by her first name. No disrespect is intended.
[8] Published case law from other jurisdictions is scant and not directly on point. Florida upheld a condition of probation prohibiting contact with any member of the child victim's family, although this de facto prohibited the defendant from contacting his own daughter, who lived with the victim's family. Russ v. State, 519 So.2d 715 (Fla.Dist.Ct.App.1988). A Mississippi trial court prohibited the defendant from contacting the families of the victim or the witnesses, but the appellate court did not consider the validity of this condition of probation. Griffith v. City of Bay St. Louis, 797 So.2d 1037 (Miss.Ct.App. 2001). Arizona upheld a condition of probation that the defendant not contact his wife who was also his co-defendant in a theft case. State v. Nickerson, 164 Ariz. 121, 791 P.2d 647 (1990). Oregon upheld a condition of probation that the defendant, convicted of obtaining money under false pretenses, could not marry without a court order because he was a bad influence on his fiancée State v. Allen, 12 Or.App. 455, 506 P.2d 528, 529 (1973). On the other hand, Oregon revised a condition prohibiting contact with persons convicted of a crime to allow contact with the defendant's husband, despite his criminal record. State v. Martin, 282 Or. 583, 589-90, 580 P.2d 536 (1978). In Stephenson v. Taylor, the district court noted a habeas petitioner had not cited any authority for a right to marry a 17-year-old girl when he was forbidden, as a sex offender, from contacting any person under 18. Stephenson v. Taylor, No. 0:06-816-RBH, 2007 WL 1068247 (S.D.S.C. Mar. 30, 2007) (unpublished).
[9] Although the court considered an e-mail from Lisa at sentencing, the contents of the email are not in the record; aside from her cooperation with the State, there is no evidence as to her wishes regarding the no-contact order.
[1] Unlike the majority I will refer to Warren's four trials in the order in which he was tried. See majority at 942 n. 1 (disregarding Warren's two mistrials).
[2] I agree with Justice Madsen that an erroneous instruction from the court on the burden of proof is not subject to a harmless error analysis. I also concur with her view that this instruction, which included the language, "So we are playing with words here in a sense," was reversible error in and of itself.
[1] As Justice Sanders notes in his dissent, Mr. Warren had four trials, two of which ended in mistrial. I refer to them as Justice Sanders does, in the order in which he was tried. Dissent at 949 n. 1.
[2] The full text of the prosecutor's and trial court's statements to the jury are set out in the majority opinion. Majority at 943-44.
[3] I offer no opinion on whether or not this court would follow the Seventh Circuit's reasoning in Bartlett and refuse to extend Sullivan to cases in which only the prosecutor misstated the burden of proof.