FILED
COURT OF APPEALS
DIVISION II

2013 APR -9 AM 9: 02

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| STATE OF WASHINGTON, | No. 42348-1-II |
| Respondent, | |
| v. | |
| JEFFERY BRIAN SMITH, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Jeffery Brian Smith pleaded guilty to first degree child molestation and witness tampering. We hold that the trial court did not abuse its discretion by including in Smith's sentence a crime-related no-contact provision that advanced public interests and was reasonably limited in its scope. And because our legislature intended to allow polygraph examinations to monitor a sex offender's compliance with treatment and other conditions of a special sex offender sentencing alternative[1] (SSOSA), we affirm Smith's judgment and sentence and the trial court's order revoking Smith's SSOSA.

## FACTS

In 2010, Smith pleaded guilty to first degree child molestation—domestic violence, for having sexual contact with his minor stepdaughter, K.M.A.[2] He also pleaded guilty to witness tampering after he called his wife—K.M.A.'s mother—from jail and directed her to have K.M.A. tell authorities that Smith did not touch her.

---

[1] RCW 9.94A.670.

[2] We use initials to protect the victim's privacy.

Before sentencing, the Department of Corrections (DOC) completed Smith's presentence investigation and report. The presentence report explained that, while he lived with K.M.A.'s mother and her family, Smith sexually abused K.M.A. Upon his initial arrest in 2009, Smith denied touching K.M.A., though he later admitted that he twice touched her. The presentence report showed that K.M.A.'s mother doubted that Smith had touched K.M.A.

Smith sought a SSOSA. To determine Smith's amenability to treatment, Dr. Mark Whitehill performed a psychosexual evaluation on Smith. Dr. Whitehill guardedly recommended treatment for Smith. He explained, "[I]n light of the defensiveness seen on testing and his lack of awareness of any of the thoughts and feelings which preceded the sexual abuse of [K.M.A.]." Clerk's Papers (CP) at 65. Dr. Whitehill recommended that Smith regularly submit to polygraph examinations to guarantee his adherence to his strictly-regimented SSOSA therapy contract.

Dr. Whitehill reiterated his conclusions at sentencing. He emphasized that rules should govern any contact between Smith and K.M.A.'s mother. Dr. Whitehill did not want Smith calling K.M.A.'s mother at her home, for example, because he feared Smith may potentially contact K.M.A. The trial court imposed a SSOSA. The judgment and sentence included a provision that prohibited Smith from having "direct or indirect contact with victim(s) or his or her family, including by telephone, computer, letter, in person, or via third party." CP at 117. Appendix H to the judgment and sentence prohibited Smith from contacting K.M.A. "in person, in writing, telephonically, electronically, and/or through [a] third party." CP at 124. It also prohibited him from having contact "with K.M.A.'s immediate family, effective immediately." CP at 124. The trial court allowed Smith to have telephone contact with K.M.A.'s mother until

K.M.A.'s mother could meet with Smith's psychosexual therapist and community corrections officer to establish strategies and boundaries to determine what kind of contact they should have and where, under what circumstances, and how frequent they may contact one another. The trial court also followed another of Dr. Whitehill's recommendations, ordering Smith to submit to polygraphs to "monitor compliance with crime-related prohibitions and law-abiding behavior." CP at 125.[3]

Later, DOC filed a notice of violation with the court, alleging three violations, including failed polygraph tests and two episodes of in-person contact with K.M.A.'s mother.[4] The State then moved to revoke Smith's SSOSA, and DOC filed a supplemental notice of violation. The supplemental notice included two more violations, one for contacting K.M.A.'s mother and the other for failing a polygraph.

At the eventual revocation hearing, the trial court found that the State proved all five of Smith's violations. Consequently, the trial court revoked Smith's SSOSA and left all contact provisions as they were initially written in the original Appendix H. Smith appeals the original judgment and sentence and the order revoking his SSOSA and modifying his sentence.

ANALYSIS

Smith first argues that the trial court revoked his SSOSA based on an improper no-contact provision that prohibited him from seeing his wife. He argues that the no-contact provision was not crime related, curbed his free association rights, and deprived him of a

---

[3] The trial court also imposed a separate domestic violence no-contact order pursuant to RCW 10.99.

[4] One of these in-person contacts with K.M.A.'s mother occurred the day Smith was released from jail.

fundamental liberty interest.[5]   Because the no-contact provision was crime-related and reasonable in scope, we disagree.

We review sentencing conditions for an abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993).   Crime-related prohibitions directly relate to the crime's circumstances. RCW 9.94A.030(10).   We typically uphold sentencing conditions if reasonably crime related. *See Riley*, 121 Wn.2d at 37.

Trial courts must sensitively impose conditions that interfere with one's fundamental rights. *Riley*, 121 Wn.2d at 37.  Rights to marriage and to the care, custody, and companionship of one's children are fundamental constitutional rights, and we subject to strict scrutiny any state interference with those rights. *State v. Warren*, 165 Wn.2d 17, 34, 195 P.3d 940 (2008), *cert. denied*, 129 S. Ct. 2007 (2009).   A sentencing court, for example, may restrict a convicted defendant's fundamental rights, but only if reasonably necessary to accomplish the essential needs of the state and public order. *Riley*, 121 Wn.2d at 37-38.

In *Warren*, our Supreme Court addressed whether sentencing conditions prohibiting a defendant from contact with his wife were reasonably crime-related or a violation of his fundamental rights, even though the wife was not the direct victim of the crime.  Warren was convicted of child molestation against his two minor stepdaughters.  165 Wn.2d at 23.  The Supreme Court held that the trial court did not abuse its discretion in imposing the no-contact provision because the wife's protection directly related to the case's crimes:  she was the two child victims' mother, Warren attempted to induce her not to cooperate in the prosecution of the

---

[5] Smith also makes a passing argument that the provision violated his rights against cruel and unusual punishment.  Because he does not brief this issue, we decline to address it.  RAP 10.3(a)(6).

crime, and she testified against Warren at trial. *Warren*, 165 Wn.2d at 34. The court then considered whether the no-contact provision violated Warren's fundamental constitutional right to marriage and to parent his children. *Warren*, 165 Wn.2d at 34. Applying strict scrutiny, the court concluded that the no-contact provision did not violate Warren's marriage rights because the provision was reasonably necessary to achieve a compelling state interest, namely, the protection of his wife and her children. *Warren*, 165 Wn.2d at 34.

Smith's case is analogous to *Warren*. Like Warren, Smith was convicted of molesting his wife's daughter. Also like Warren, Smith attempted to induce his wife not to cooperate in the prosecution of the crime. Smith even went so far as to attempt to persuade his wife to convince K.M.A. to lie under oath and deny that Smith touched her—a crime that resulted in another criminal conviction for Smith. Smith's initial no-contact provision, however, differs from Warren's in that Smith's was expressly a temporary no-contact provision that allowed Smith to telephonically contact K.M.A.'s mother and provided for the possibility of additional future contact upon a therapist's approval. Warren's no-contact order extended for life. *Warren*, 165 Wn.2d at 31.

Analogizing the facts here to *Warren*, we conclude that Smith's no-contact provision was crime related. Then, strictly scrutinizing the no-contact provision, we see that it furthered essential needs of the state and public order—protecting K.M.A. and reducing Smith's opportunity to use K.M.A.'s mother as a conduit through which to influence K.M.A. And finally, we conclude that the no-contact provision was reasonably necessary and narrowly tailored to accomplish those needs, a temporary provision that could be loosened depending on

the approval of Smith's SSOSA therapist. Accordingly, Smith cannot demonstrate that the trial court abused its discretion in imposing a no-contact provision in his judgment and sentence.

Next, Smith appears to argue that the trial court improperly revoked his SSOSA because it exceeded its authority by requiring him to submit to polygraph exams. He asserts that a sentencing court may not require an offender to engage in affirmative conduct that is not crime related. Again, we disagree.

Statutory interpretation is a question of law that we review de novo. *Pac. Cont'l Bank v. Soundview 90, LLC*, 167 Wn. App. 373, 379, 273 P.3d 1009, *review denied*, 175 Wn.2d 1018 (2012). RCW 9.94A.030(10) provides:

> "Crime-related prohibition" means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct. However, affirmative acts necessary to monitor compliance with the order of a court may be required by the department.

RCW 9.94A.505(8), too, allows affirmative conduct: "As part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter." And, RCW 9.94A.703(3) allows a sentencing court to impose affirmative conditions as part of a community custody sentence. It may order an offender to "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.703(3)(d).

The SSOSA statute also allows for affirmative conditions. It provides that a sentencing court may impose, as conditions of the suspended sentence, "[s]pecific prohibitions and

affirmative conditions relating to the known precursor activities or behaviors identified in the proposed treatment plan under subsection (3)(b)(v) of this section." RCW 9.94A.670(5)(d). The referenced subsection, in turn, explains:

> The examiner shall assess and report regarding the offender's amenability to treatment and relative risk to the community. A proposed treatment plan shall be provided and shall include, at a minimum:
>
> . . . .
>
> (v) Recommended crime-related prohibitions and affirmative conditions, which must include, to the extent known, an identification of specific activities or behaviors that are precursors to the offender's offense cycle.

RCW 9.94A.670(3)(b)(v).

Here, the trial court included community placement and community custody conditions on Smith's judgment and sentence. One required that Smith "submit to urinalysis testing and polygraph examinations to monitor compliance with crime-related prohibitions." CP at 125.

Smith cites *In re Detention of Hawkins*, 169 Wn.2d 796, 238 P.3d 1175 (2010), to argue that trial courts cannot order polygraph exams. But *Hawkins* involved the use of polygraphs for an entirely different purpose. In *Hawkins*, the State sought to compel Hawkins to submit to polygraph exams to determine whether he was a sexually violent predator. 169 Wn.2d at 799. Our Supreme Court held that the trial court exceeded its statutory authority in ordering the pretrial polygraph exam because the legislature never intended to authorize polygraphs under RCW 71.09.040(4), the statute relating to sexually violent predator petitions and probable cause hearings. *Hawkins*, 169 Wn.2d at 801-03.

The State cites *State v. Riles*, 135 Wn.2d 326, 957 P.2d 655 (1998), *abrogated on other grounds by State v. Sanchez Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010), to support its argument that the legislature intended to allow polygraph examinations as a part of a SSOSA

program. In *Riles* our Supreme Court noted that trial courts have authority to impose polygraph monitoring conditions. *Riles*, 135 Wn.2d at 342. The Supreme Court further acknowledged the validity of polygraphs as an investigative tool. *Riles*, 135 Wn.2d at 342. Since *Riles*, our legislature has amended our sentencing statutes numerous times, but the relevant statutory language—that the legislature intended to allow polygraphs for monitoring compliance with sentencing conditions—remains in effect. *See* RCW 9.94A.030(10) (allowing "affirmative acts necessary to monitor compliance with the order of a court"); RCW 9.94A.670 (allowing affirmative, crime-related conditions relating to behaviors identified in a proposed SSOSA treatment plan).

While *Hawkins* holds that trial courts may not compel polygraphs under RCW 71.09.040(4), regarding sexual violent predator petitions, the court did not analyze polygraph exams under the SSOSA or community custody statutes. Under the SSOSA statute, for example, the legislature appears to expressly authorize a sentencing court to impose affirmative conditions on a defendant, relating to his known precursor activities or behaviors "identified in the proposed treatment plan." RCW 9.94A.670(5)(d). Polygraph exams are a type of affirmative conduct, and Dr. Whitehill's SSOSA recommendation specifically called for polygraph testing as part of Smith's treatment and monitoring. Therefore, we hold that the legislature allows for polygraph testing as a means of monitoring and assuring sex offender's compliance with treatment and other court ordered conditions pursuant to a SSOSA.

Accordingly we reject Smith's argument that the trial court erred when it revoked his SSOSA. We hold that the no-contact provision is valid because it is crime-related, necessary to

8

No. 42348-1-II

protect the victim, and reasonably necessary in scope. Finally, the court was within its authority

to order polygraph testing as a condition of Smith's SSOSA.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Hunt, J.

Bjorgen, J.

9