# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 49526-1-II |
| MARTIN STANLEY IVIE, | UNPUBLISHED OPINION |
| Petitioner. | |

BJORGEN, J. — Martin Stanley Ivie seeks relief from personal restraint imposed following his convictions of two counts of first degree assault, one count of third degree assault, and one count of attempting to elude a pursuing police vehicle.

Ivie argues that the prosecutor improperly impugned defense counsel's role and integrity during rebuttal closing argument. He argues also that defense counsel was ineffective because he failed to (1) consult with a qualified crime scene expert, (2) introduce veterinary records and testimony that would corroborate his testimony, (3) present testimony from his emergency room physician, Thomas J. Ferrer, M.D., to address his physical and mental condition at the time he provided a statement to police at the hospital, (4) present testimony from Dr. Ferrer as to the location of Ivie's gunshot wounds, (5) present testimony from Dr. Ferrer to rebut the impeachment of Ivie's direct testimony with his hospital statement, (6) introduce photographs of his gunshot wounds to challenge the State's version of the shooting, (7) prepare him to testify, (8) present an adequate closing argument including basic exculpatory facts, (9) object to testimony regarding the computer-based crime scene reconstruction, and (10) locate and interview lay witness Aaron Churchill to corroborate his story. Finally, Ivie argues that the cumulative effect of the claimed errors denied him a fair trial.

On the claim of prosecutorial misconduct, we hold that the challenged comments by the prosecutor were improper, but not flagrant and ill-intentioned or prejudicial. On the claims of ineffective assistance of counsel, we hold that the failure to contact Dr. Ferrer regarding Ivie's physical and mental condition when he provided his hospital statements was deficient, but not prejudicial. We assume that the failure to prepare Ivie for cross-examination was deficient, but hold it did not prejudice him.

We previously remanded the claim that defense counsel failed to locate and interview Churchill to the superior court for a reference hearing to determine necessary issues of fact. On the basis of the superior court's findings of fact on that reference hearing, we hold that defense counsel did not act deficiently with respect to Churchill. On all other claims of ineffective assistance, we hold that the challenged actions of defense counsel were not deficient. Finally, we hold that the cumulative effect of the errors claimed by Ivie did not deprive him of a fair trial.

For these reasons we deny Ivie's personal restraint petition (PRP).

FACTS

The facts underlying Ivie's conviction are set forth in our unpublished opinion from his direct appeal. *See State v. Ivie*, No. 44258-2, slip op at 187 Wn. App. 1008 (Wash. Ct. App. Apr. 21, 2015) (unpublished). We include here only the facts necessary to resolve the issues Ivie raises in this PRP.

I. IVIE'S ENCOUNTER WITH OFFICERS

On a dark, wet, and foggy night, Deputy William Reed was on surveillance at a site from which he suspected someone had been stealing wood. *Ivie*, slip op at 187 Wn. App. 1008, at *2. A pickup truck eventually arrived at the site, and Reed observed an individual exit the truck and

begin working with the wood. *Id*. at \*2-3. Reed attempted to get a clearer view of the suspect as Sergeant Travis Adams arrived in his marked patrol car. *Id*. at \*3. Reed recognized the suspect as Ivie and ordered him to get on the ground. *Id*. Ivie ignored Reed's orders, got in his truck and drove away in the direction of Adams. *Id*.

Reed pursued on foot as Ivie quickly turned his truck around and proceeded back the way he had come, accelerating toward Reed. *Id*. Reed pointed his flashlight toward Ivie's oncoming truck. *Id*. The road was narrow and provided only about two feet of space on either side of Ivie's truck. *Id*. Ivie did not stop as he approached Reed. *Id*. When the truck came within about five yards, Reed jumped out of the way to avoid it, and Ivie continued down the road. *Id*. Adams pursued Ivie in his patrol car with emergency lights flashing. *Id*.

Soon after, Ivie stopped his truck. *Id*. As Adams' patrol car slowed, Ivie put his truck into reverse and backed into the front of Adams' car. *Id*. Ivie then turned and proceeded up a steep side road. *Id*. Adams followed Ivie up the side road until he observed Ivie come to a landing. *Id*. Ivie stopped the truck on the landing, and Adams stopped about 20 feet behind him. *Id*.

Adams got out of his car with his assault rifle and began backing down the roadway to a point about 30 feet behind his car, coming to stand at the foot of an embankment. *Id*. at \*4. Adams issued orders to Ivie, who remained in his truck. *Id*. Ignoring the orders, Ivie turned his truck around and accelerated directly at Adams. *Id*. Adams was afraid he may have been "squished or killed," so he moved out of the way sideways along the embankment. *Ivie*, at \*5. As Adams moved sideways along the embankment, he fired four shots at Ivie's truck and, as Ivie

continued down the road, he fired four additional shots. *Id*. Ivie crashed into trees at the bottom of the embankment. *Id*.

Ivie sustained multiple gunshot wounds and was taken to a hospital emergency room for treatment. *Id*. Roughly 16 hours later, two detectives arrived at the hospital to read to Ivie his *Miranda*[1] rights and to interview him. *Id*. Ivie provided a recorded statement. *Id*.

## II. PROCEDURAL HISTORY

The State charged Ivie with (1) two counts of first degree assault, based on the incidents in which he drove his truck toward Reed and, later, Adams, (2) two counts of second degree assault based on the same conduct, (3) one count of third degree assault, based on the incident in which he backed his truck up into Adams' patrol car, (4) one count of attempting to elude a pursuing police vehicle, and (5) one count of second degree theft, based on Ivie's activities at the felled maple tree on or about February 9. *Id.* at *6. The jury returned guilty verdicts on all counts as charged. *Id*. The trial court entered convictions on all the verdicts, except those for the alternative second degree assault charges, which the court vacated. *Id*. Ivie appealed. *Id*. at *7. In his direct appeal, we reversed Ivie's conviction of second degree theft, but we affirmed all of his remaining convictions. *Id*. at *1-2.

Ivie subsequently filed the present PRP. We remanded the matter to superior court for a reference hearing to determine certain issues of fact relating to Ivie's claim that defense counsel failed to locate and interview Churchill, a potential witness. The superior court held the reference hearing and issued findings of fact on the referred issues.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

### III. ADDITIONAL FACTS

A.    Defense Counsel's Closing Argument

Defense counsel, James P. Foley, made closing remarks, in pertinent part, as follows:

> You know, there's a saying in the law, or an expression we use in the law that says a philosopher is a blind man at midnight in a cellar looking for a black cat that isn't there. He's distinguished from the theologian in that the theologian finds the cat. He is further distinguished from the prosecutor who smuggles the black cat into the cellar under his coat and emerges to try and produce it. That is what is going on here, ladies and gentlemen of the jury.
>
> Martin Ivie was shot. And whether it was excessive or not is not your issue. Martin Ivie was shot. And now the State wants you to believe oh, he was shot because he was assaulting officers. Not stealing wood, he was assaulting officers. That is a black cat in a cellar at midnight that isn't there.
>
> You go back and you read all of the jury instructions carefully, and you look at all the evidence, and you weigh all the testimony you've heard, and return verdicts of not guilty on all of the assault counts and the eluding.

Verbatim Report of Proceedings (VRP) at 773-74.

B.    Prosecutor's Closing Rebuttal Argument

The State made closing rebuttal argument, in pertinent part, as follows:

> Apparently *Mr. Foley* [defense counsel] *wants you to ignore the testimony* of, for instance, Fred Doughty and Martin Hayes – and I'll come right back to it in a moment and talk about it. He wants you to focus only, and solely, and entirely, on the testimony of Martin Ivie, the defendant in this very serious case.

VRP at 775 (emphasis added).

> But *Mr. Foley wants you to forget* about everything else that you heard evidence of, and he wants to continue to talk about the shooting, but then rightfully tell you that that isn't what this case is about.

VRP at 775 (emphasis added).

> Again, thank goodness for headlights. *Mr. Foley would have you believe that these rogue cops* dressed in black in the dark of night were just in the road and nobody could see them. As he's driving straight at Deputy Reed, right in the middle of the headlights with Deputy Reed's flashlight shining back at the car, Deputy Reed shouts into his radio, he's coming right at me; has to jump out of the way so

as not to get hit. And it's a second or two later that Sergeant Adams goes by and can see when he goes by, and Deputy Reed is not in the roadway in the headlights.

VRP at 780 (emphasis added).

*Mr. Foley says* that the angles of the shots that Sergeant Adams fired don't add up. Apparently *he's really asking you to again ignore the testimony* of all of the witnesses, including Mr. Hayes, who evaluated the vehicle, and evaluated all the measurements that the Thurston County Sheriff's Office produced.

VRP at 781 (emphasis added).

C.      Testimony of Adams

A major point of contention in this matter involves Adams' testimony about his position in relation to Ivie when he fired the shots. In *Ivie*, we stated:

As Adams moved sideways along the embankment, he held his assault rifle up as high up as he could, attempting to get the barrel on the same level as Ivie, and fired four rounds. The truck straightened out and went off the embankment. As the truck passed him, Adams fired four additional rounds into the driver's side door area. The truck proceeded down the embankment, crossing the road behind Adams's car and crashing into trees and bushes at the bottom of the embankment on the other side of the road.

*Ivie*, slip op at 187 Wn. App. 1008, at \*3.

However, Adams' exact position is somewhat ambiguous. Adams testified that he would have been hit "dead center" and "squished or killed" if he had not moved out of the way. VRP at 315. Adams said that as he was moving laterally out of the way of Ivie's truck along the embankment:

I took my rifle and held it up high, so that I could try to get it up to the driver's height. And I fired at the driver in the vehicle at that point to try and get him to stop – stop driving and run me over. . . . But I was down on the bank below the level of the vehicle and the truck was up above me. So I wanted to get my rifle up in the air as high as I could, hoping to get the rounds into the truck.

VRP at 316. Adams also testified:

6

> At the time that I . . . fired the first four rounds . . . I was surprised that I didn't get hit. I was surprised that I was able to move across the bank fast enough to not get hit by the front of the truck. I didn't bother firing any rounds at that point because I would have hit nothing but grille.

VRP at 320. He further stated:

> I was still very concerned that that truck was going to go sideways and come off the bank and hit me. With those first four rounds I was just trying to get the driver to stop that behavior so that I didn't get squished by the truck.
> . . . .
> At that point the vehicle straightened – seemed to straighten out and it came off the bank right where I had been standing a second before. I turned at that point and shined my light again on the truck. And what I could see was the driver was down hanging on the steering wheel and had turned and was looking down the road, basically in the direction from which we had just come up.

VRP at 318. "My concern at that point was if this truck gets behind me and starts heading back down this road from where we came from . . . that there was going to be a collision . . . so I fired again at the vehicle." VRP at 319.

From the time Adams started to move laterally to the point where he fired the second volley of shots, Ivie's truck was continuously accelerating in a forward direction. Adams' testimony suggests that he fired four rounds at the driver's side of the truck as it was moving toward him and then an additional four rounds at the driver's side as it was moving past and away from him.

D.     Testimony of Detective Cameron Simper

The State called Cameron Simper, a detective for the Thurston County Sheriff's Office, as an expert witness. Simper was assigned as the lead investigator in Ivie's case. The State introduced several computer-generated images of the crime scene through the testimony of Simper.

7

Simper testified that investigators used a program called "Total Station," which is "computer software that generates an image . . . [a] two-dimensional, three-dimensional image to represent what was . . . located at the scene." VRP at 221. He testified, "Due to the . . . total station we can map . . . the trajectory . . . of bullets." *Id*. He testified investigators used the software to map "the progression of Ivie's pickup truck based on the tire tracks that were located at the scene." *Id*. at 223. He testified investigators "[a]lso used the total station equipment to mark the expended casings from Sergeant Adams' patrol rifle, and also the resting point of Ivie's vehicle, as well as other items of evidentiary value that were collected at the scene." *Id*.

E.      Testimony of Fred Doughty

Fred Doughty was the first expert witness that Foley called in Ivie's defense. Doughty testified that he worked in "law enforcement for about 22 years" prior to his current position as a "private investigator." VRP at 358. Doughty did not testify as to whether he was a forensics expert.

Foley asked Doughty if he could make some "general observations . . . about trajectories, and where bullets might have come from, and that sort of thing?" VRP at 375. Doughty responded, "Yes, sir." *Id*. Foley then stated,

> Okay. And if you could, we're going to test out your artistic skills. Having seen this – been to the scene, could you draw us a picture of where the – on the landing the travel trailer was, and the police car, and the path of Mr. Ivie's car based on all of your observations and expertise?

*Id*. To which, Doughty responded, "I can try." *Id*. Doughty then drew a picture of the incident, including trajectories and vehicle orientation, in response to Foley's questions.

Ivie claimed that his dog was with him at the time of the incident. Doughty testified that he had reviewed the veterinary records, which confirmed that Ivie's dog had sustained a gunshot

wound. Reed and Adams testified that they did not see or hear a dog during the events of that night. However, Adams testified also that "as I was moving down [towards Ivie's truck that crashed], it sounded like something scurried off into the brush, or moved into the brush line." VRP at 351. He did not "know what it was." *Id*.

F.      Testimony of Marty Hayes

Marty Hayes was the second expert witness Foley called in Ivie's defense. Foley questioned Hayes about his qualifications as follows:

| [Foley]: | And in your several dozen times testifying in court you've been qualified as an expert in, like I said before, the use of force, yes? |
|---|---|
| [Hayes]: | Yes. |
| [Foley]: | Ballistics? |
| [Hayes]: | Yes. |
| [Foley]: | Crime scene reconstruction? |
| [Hayes]: | Yes. |
| [Foley]: | Blood stain pattern analysis? |
| [Hayes]: | Yes. |

VRP at 458.

Hayes provided his expert opinion as to the path of Ivie's vehicle, in part, as follows:

That opinion would be that he was – the vehicle itself was veering away from Sergeant Adams' vehicle, and of course where Sergeant Adams said he was. And I base that on the – the picture that I saw, the trajectory of the rounds, the – the tracks in the grass and in the – the mud that were – were provided to me, and frankly Sergeant Adams['] own statement that he gave to investigating officers where he said that it wasn't coming at him any longer when he fired the shots.

VRP at 461-62.

9

G.      Testimony of Barbara Marx

Barbara Marx and Ivie lived together. Marx testified that she was with Ivie prior to the incident. She further testified that Ivie had his dog with him when he left that night. Marx claims that, on the day following the incident, she found Ivie's dog who was "bloody, and . . . [his] neck was all swollen." VRP at 485. Marx testified she took the dog to the veterinarian. Marx opined that Ivie's dog had been shot.

H.      Testimony of Ivie

Ivie testified as to the location of his gunshot wounds as follows: "I was hit – grazed here, on top of my head, and two in my back." VRP at 592.

Ivie argues that he was in pain and heavily medicated at the time he was interviewed by detectives at the hospital. He testified that "I was told that I was on morphine and also OxyContin." VRP at 552. Ivie's eyes were closed throughout the interview and his speech was somewhat slurred during the first portion of it. *Ivie*, slip op at 187 Wn. App. 1008, at *3. The detectives, however, described Ivie as alert. *Id.* Ivie also testified that he had his dog with him at the time of the incident.

ANALYSIS

I. PRP LEGAL PRINCIPLES

To be entitled to collateral relief through a PRP, the petitioner must first prove error by a preponderance of the evidence. *In re Pers. Restraint of Crow*, 187 Wn. App. 414, 420-21, 349 P.3d 902 (2015). Second, if the petitioner is able to show error, he or she then must also prove prejudice, the degree of which depends on the type of error shown. *Id*. at 421.

If a constitutional error, the petitioner must demonstrate it resulted in actual and substantial prejudice to him. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 409, 114 P.3d 607 (2005). "Actual and substantial prejudice, which 'must be determined in light of the totality of circumstances,' exists if the error 'so infected petitioner's entire trial that the resulting conviction violates due process.'" *Crow*, 187 Wn. App. at 421 (quoting *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985)). If a nonconstitutional error, the petitioner must meet a stricter standard and demonstrate the error resulted in a fundamental defect, which inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015); *Woods*, 154 Wn.2d at 409. If the petitioner fails to make a prima facie showing of either actual and substantial prejudice or a fundamental defect, we deny the PRP. *Schreiber*, 189 Wn. App. at 113.

The PRP must be supported with facts or evidence and may not merely rely on conclusory allegations. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). If allegations are based on evidence external to the existing record, the petitioner must show that he has competent, admissible evidence to establish the facts that entitle him to relief. *Id*.

> "If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits . . . must contain matters to which the affiants may competently testify."

*Id*. at 488-89 (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)). "The petitioner must show that the 'factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.'" *Id*. at 489 (quoting *Rice*, 118 Wn.2d at 886).

11

## II. PROSECUTORIAL MISCONDUCT

Ivie argues that the prosecutor committed flagrant and ill-intentioned misconduct by disparaging the role and integrity of defense counsel. We agree that the prosecutor's comments were improper, but we disagree that they were flagrant and ill-intentioned or prejudicial.

A.      Legal Principles

To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

We analyze prejudice in misconduct claims under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, the defendant need only show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Id.* If, however, the defendant did not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Id.* at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). Because Ivie did not object to the claimed misconduct by the prosecutor, we apply the latter two-part test.

B.     Improper Remarks in Prosecutor's Rebuttal Closing Argument

Ivie claims four instances when the prosecutor allegedly "impugned the role and integrity of defense counsel" in his rebuttal closing argument. Br. of Pet'r at 40. The prosecutor stated, in pertinent part, as follows:

> Apparently *Mr. Foley wants you to ignore the testimony* of, for instance, Fred Doughty and Martin Hayes.
>
> . . . .
>
> But *Mr. Foley wants you to forget* about everything else that you heard evidence of.
>
> . . . .
>
> Again, thank goodness for headlights. *Mr. Foley would have you believe that these rogue cops* dressed in black in the dark of night were just in the road and nobody could see them.
>
> . . . .
>
> *Mr. Foley says* that the angles of the shots that Sergeant Adams fired don't add up. Apparently *he's really asking you to again ignore the testimony* of all of the witnesses.

VRP at 775, 780-81 (emphasis added.)

Ivie points to *Warren* to support his argument that the prosecutor's statements were improper. 165 Wn.2d at 29. In *Warren*, the court concluded that "it was improper for the prosecutor to tell the jury there were a 'number of mischaracterizations' in defense counsel's argument as 'an example of what people go through in a criminal justice system when they deal with defense attorneys.'" *Id*. Additionally, the prosecutor "described defense counsel's argument as a 'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing.'" *Id*.

13

Although the court concluded these statements were improper, the statements were not so flagrant and ill-intentioned that a curative instruction could not have obviated the prejudice. *Id.* at 29-30.

Ivie also cites *State v. Negrete*, 72 Wn. App. 62, 66, 863 P.2d 137 (1993), in which during closing argument defense counsel cast an undercover police officer as a "trained liar" and a confidential informant as a snitch paid to "frame people." *Id.* at 66. In rebuttal, the prosecutor stated:

> I have listened with great interest to the comments of [defense counsel]. Two things come to mind: I have never heard so much speculation in my entire life in going into facts that weren't even presented into evidence. And the second is, *he is being paid to twist the words of the witnesses by Mr. Negrete.*

*Id.* at 66. The court concluded the statement was improper, but held that there was no prejudice because Negrete did not establish a substantial likelihood that the remark affected the jury's verdict. *Id.* at 67-68.

The prosecutor's statements here and in *Warren* rest on a common core: the accusation, either express or plainly implied, that defense counsel did not fairly present the evidence in an attempt to mislead the jury. In each case, the prosecutor's message was that defense counsel wanted the jury to ignore facts and violate their oath. This message crosses the line from legitimate, aggressive argument into unsupported personal attacks on defense counsel's motivation and purpose. We follow the Supreme Court's decision in *Warren* and hold that the prosecutor's comments here impugned the role of defense counsel.

The State also maintains that the prosecutor's statements were proper because they were invited or provoked by defense counsel's closing argument. The State claims that counsel's extended metaphor contained accusations that the prosecution had deceived the jury. The State

14

argues that the defense counsel's accusations permitted the prosecutor to respond in kind. However, whether or not this is an accurate characterization of the defense's argument, an improper argument by one party does not license a rebuttal that itself descends to the improper. The State's attempted justification is not persuasive.

On balance, we conclude the prosecutor's statements were improper because they impugned the role and integrity of defense counsel and were not justified by defense counsel's closing argument.

C.      Prejudice: Heightened Standard

As noted, Ivie will be deemed to have waived his prosecutorial misconduct claim unless he shows that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *See Emery*, 174 Wn.2d at 761. Ivie makes neither showing.

To meet the first of these prongs, Ivie must show that the challenged remark "'is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *See Thorgerson*, 172 Wn.2d at 443 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 757 (1994)). The impropriety in the prosecutor's remarks was the message that defense counsel wanted the jury to ignore facts and violate their oath. A reasonable curative instruction would have informed the jury that the prosecutor's remarks were improper and directed them not to consider those remarks, thus likely removing prejudice and placing the prosecutor in a less than flattering light. Ivie thus does not make the first showing.

15

The second showing in the heightened standard is that of "a substantial likelihood that the misconduct affected the jury verdict." *Emery*, 174 Wn.2d at 760. "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *Warren*, 165 Wn.2d at 28.

Although the prosecutor's comments were improper, in the context of the total argument they were not prejudicial. In *Negrete*, the court concluded the defendant could not show prejudice even when the prosecutor openly claimed defense counsel was "being paid to twist the words of the witnesses" by the defendant. 72 Wn. App. at 66 (emphasis omitted). The remarks by the prosecutor here essentially reminded the jury to weigh evidence that defense counsel had not mentioned, although in a way that improperly attributed a motive to defense counsel. Their effect is much less potent than the remarks in *Negrete*. Given the weight of the evidence against Ivie and the nature and context of the prosecutor's remarks, we do not see a substantial likelihood that those remarks affected the verdict.

Ivie has not shown that either prong of the heightened standard from *Emery* is met. Therefore, his claim of prosecutorial misconduct fails.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Ivie argues that defense counsel was ineffective for several reasons. We analyze each claim in turn.

A.    Legal Principles

A claim of ineffective assistance of counsel "presents a mixed question of fact and law reviewed de novo." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To demonstrate ineffective assistance of counsel, Ivie must satisfy the two-pronged test laid out in

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 674 (1984). If Ivie fails

to establish either prong of the test, we need not inquire further. *State v. Foster*, 140 Wn. App.

266, 273, 166 P.3d 726 (2007).

First, Ivie must show that counsel's performance fell below an objective standard of

reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To

demonstrate deficient performance, the record must show no legitimate strategic or tactical

rationale for the trial attorney's decisions. *McFarland*, 127 Wn.2d at 335-36. Second, Ivie must

show prejudice. *Id*. at 335. Prejudice exists if there is a reasonable probability that, but for

counsel's errors, the result of the proceeding would have differed. *State v. Grier*, 171 Wn.2d 17,

34, 246 P.3d 1260 (2011). In the context of a PRP, a petitioner who shows prejudice under this

standard effectively meets his burden in showing actual and substantial prejudice on collateral

attack. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 848, 280 P.3d 1102 (2012).

Still, we must be "highly deferential" in evaluating a challenged attorney's performance.

*Strickland*, 466 U.S. at 689. We strongly presume that the appellant received effective

representation. *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995).

B.      Failure to Call Crime Scene or Forensic Expert Witnesses

Ivie argues that his defense counsel's failure to consult with a qualified crime scene or

forensics expert was deficient and prejudiced his right to a fair trial. We disagree.

On the matter of deficiency, he claims that had a qualified crime scene or forensics expert

presented testimony, he or she would have rebutted the State's evidence and corroborated his

testimony that he was not driving directly toward Adams when Adams fired the shots. Ivie

supports his claim with an expert's declaration and post-conviction lab report. Additional expert

testimony, Ivie argues, would have controverted the State's theory as to the path of the vehicles, trajectory of the bullets, and his resulting gunshot wounds.

However, the evidence at trial indicated that Ivie began accelerating directly at Adams. *Ivie*, slip op at 187 Wn. App. 1008 at *4. Adams then moved out of the way sideways along the embankment and fired four initial shots at Ivie's truck and, as Ivie continued down the road, four additional shots. *Id*. at *5. The expert report only provides an opinion that Adams "was not in the direct line of travel by Mr. Ivie's truck at the time any of the eight shots were fired." Br. of Pet'r, Decl. of Kay Sweeny, App. 1-6, at 4. Thus, the report is not dispositive of whether Ivie ever drove directly at Adams, the critical element of the assault charge.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004); *see also State v. Mannering*, 150 Wn.2d 277, 287, 75 P.3d 961 (2003) (failure to call defense expert witness was strategic). Defense counsel called private investigator Doughty to provide expert opinion testimony. Doughty provided testimony regarding, among other matters, the path of the vehicles and trajectory of the bullets. Defense counsel had Doughty draw a picture in court that illustrated his opinion as to vehicle orientation and bullet trajectory. Counsel's questioning revealed that the testimony of Doughty was part of counsel's strategy to counter the State's forensic evidence.

Defense counsel also called firearms expert Hayes who testified that he had experience in the use of force, ballistics, accident reconstruction, and blood stain pattern analysis. The examination likewise countered the State's evidence as to vehicle orientation and bullet trajectory. Hayes testified that "the vehicle itself was veering away from Sergeant Adams'

18

vehicle, and of course where Sergeant Adams said he was." VRP at 461-62. The decision to rely on the testimony of Doughty and Hayes on these points was a legitimate strategic choice.

Ivie therefore has not shown that defense counsel was deficient for calling these individuals, instead of others. Because Ivie has not established deficient performance, this claim fails.

C.      Failure to Introduce Veterinary Records and Testimony

Ivie argues that his defense counsel's failure to introduce veterinary records and testimony was deficient and prejudiced his right to a fair trial. Ivie supports his claim with a copy of the veterinary records and the declarations of two veterinarians who reviewed the records. He claims this failure to introduce was deficient because the records and testimony would have weakened Reed's credibility and strengthened his credibility. We disagree.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *Davis*, 152 Wn.2d at 742. Reed and Adams testified that they did not see or hear a dog during the events of that night. Testimony from Ivie and Marx showed that Ivie had his dog with him at the time of the incident and that the dog may have been shot. At trial, Doughty testified that he reviewed the veterinary records, which verified the dog had suffered a gunshot wound.

However, evidence that the dog was shot during the incident would not contradict the officers' testimony that they did not see or hear a dog during the events. Thus, veterinary records or testimony showing the dog was shot would have had no effect on Reed's credibility and would, at best, only add cumulative weight to Ivie's story. Defense counsel was not deficient in not offering the veterinary evidence.

19

D.  Failure to Contact or Call Dr. Ferrer at Ivie's CrR 3.5 Hearing

Dr. Ferrer cared for Ivie while he was at the hospital following the shooting. Ivie avers that defense counsel's failure to contact Dr. Ferrer or call him to testify at the CrR 3.5 hearing regarding Ivie's physical and mental condition when the police interrogated him was deficient. Further, he argues this failure "prejudiced his ability to challenge the admissibility of his hospital statement and prejudiced him at trial." Br. of Pet'r at 20. We agree that defense counsel's failure to contact Dr. Ferrer was deficient, but we disagree that it was prejudicial.

1. PRP Threshold

The State claims that this issue was already raised and decided on direct review in *Ivie*. In the context of a PRP, "'[a] defendant may not recast the same issue as an ineffective assistance claim; simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previous rejected claim.'" *Davis*, 152 Wn.2d at 671 (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)).

On direct appeal, Ivie claimed that "the admission of the statements he made in the hospital violated his right to due process because he made them involuntarily." *Ivie*, slip op at 187 Wn. App. 1008, at *6. In response, we noted that "Ivie presented no expert medical testimony concerning his condition at the time or the effects of any drugs he had taken." *Id.* at *7. We held, however, that the evidence presented was sufficient to support the conclusion that Ivie made the hospital statements voluntarily. *Id.* at *13.

In his PRP, Ivie claims that defense counsel "never interviewed . . . [his] doctor as to the nature of his injury or his condition at the time of his hospital interrogation." Br. of Pet'r at 22. To support his claim, Ivie provides a declaration from Dr. Ferrer describing Ivie's injuries,

stating that Ivie reported severe pain, and describing the morphine doses that Ivie received. Ivie also provides a supplemental declaration from Dr. Ferrer that states defense counsel never contacted him.

While we did conclude that Ivie's hospital statements were properly admitted, we did not make a judgement as to whether counsel was ineffective for failing to investigate and obtain testimony from Dr. Ferrer. Therefore, Ivie's present claim differs from the one raised on direct review and, as such, we consider his ineffective assistance of counsel claim.

2. Failure to Contact Dr. Ferrer was Deficient

Ivie claims that testimony from Dr. Ferrer "would have corroborated and elaborated . . . that he was in pain and heavily medicated at the time he was interrogated." Reply Br. of Pet'r at 7; *see also* Br. of Pet'r at 23. He believes Dr. Ferrer's testimony would have supplied evidence that he did not provide a knowing and voluntary waiver of his right to silence. *Id*.

Dr. Ferrer's declaration provides a detailed medical description of Ivie's gunshot wounds. The declaration also states that Ivie reported severe pain and had been administered morphine. The medical reports attached to Dr. Ferrer's declaration show that Ivie was given morphine intravenously five times on February 10, 2010 and that Percocet was ordered but not administered. Further, Dr. Ferrer states that "it is frequently difficult to obtain information from a patient who is experiencing extreme pain and receiving morphine." Br. of Pet'r at 53. Finally, Dr. Ferrer stated that if subpoenaed, he would have testified consistently with his declaration and the medical records. This evidence would have been relevant to the nature of Ivie's surgery, the severity of his wounds, and the effect of extreme pain and morphine.

In Ivie's direct appeal, we outlined the trial court's oral findings as follows:

> (1) [P]olice obtained permission from hospital staff before questioning Ivie, (2) Ivie was well enough to walk at the time, (3) Ivie generally gave coherent, responsive answers to their questions, without significant pauses, (4) when police asked open ended questions, Ivie gave detailed answers and added his own thoughts, (5) Ivie admitted that he had memories of the interrogation independently of the recording, and (6) no evidence showed that police sought to coerce Ivie or overbear his will. The court also noted that Ivie presented no evidence of the exact nature, timing, or duration of the surgery or of the severity of his wounds, other than his own testimony that he had been repeatedly shot, suffered a concussion, and was under the influence of morphine and OxyContin.

*Ivie*, slip op at 187 Wn. App. 1008, at *7. However, we only made this decision, in part, because "Ivie presented no expert medical testimony concerning his condition at the time or the effects of any drugs he had taken." *Id*. at *7.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *Davis*, 152 Wn.2d at 742. However, this does not relieve an attorney of the

> duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691.

Dr. Ferrer declared that defense counsel did not contact him. Dr. Ferrer was Ivie's treating physician immediately after the shooting and was the primary source of information regarding Ivie's medical condition before he provided a recorded statement. Defense counsel should have contacted Dr. Ferrer, at least, to rule out whether Ivie was capable of providing a knowing and voluntary waiver. *See State v. Ray*, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991) ("Failure to investigate or interview witnesses, or to properly inform the court of the substance of

their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest.").

Because counsel did not reasonably investigate whether Dr. Ferrer had information pertaining to Ivie's physical and mental condition after the shooting, it was impossible for counsel to have made an informed decision as to whether Dr. Ferrer should testify at the CrR 3.5 hearing. Accordingly, defense counsel was deficient.

3. Failure to Contact Dr. Ferrer was Not Prejudicial

Dr. Ferrer's declaration does not contradict the trial court's oral findings. While Dr. Ferrer declared that it is "frequently difficult" to obtain information from a patient experiencing pain and under the influence of morphine, he did not claim to have any personal knowledge of Ivie's interrogation or the circumstances in which he provided information in response to questioning. Thus, Dr. Ferrer's declaration does not show that it was difficult for Ivie to provide information in his circumstances.

Further, consistently with the trial court's findings, Dr. Ferrer did not declare that Ivie would have been incapable of providing coherent answers to police questioning. Although Dr. Ferrer would have been able to provide testimony of the exact nature, timing, and duration of the surgery and of the severity of Ivie's wounds, his testimony, as reflected in his declaration, would not have undermined the trial court's findings regarding the circumstances and manner in which Ivie responded to police questioning. For this reason, Ivie fails to demonstrate that the failure to contact or call Dr. Ferrer to testify prejudiced Ivie. Because Ivie has not demonstrated prejudice, his claim of ineffective assistance fails.

E.        Failure to Call Dr. Ferrer at Trial Regarding Hospital Statement

Related to the previous issue, Ivie argues that defense counsel's failure to obtain Dr.

Ferrer's testimony was deficient and prejudiced him at trial because his credibility had been

attacked through impeachment and Dr. Ferrer would have served to rehabilitate his credibility.[2]

We agree that defense counsel's failure to contact Dr. Ferrer was deficient, but we disagree that

it was prejudicial.

Ivie argues that because defense counsel failed to investigate or call Dr. Ferrer, he lost an

opportunity to explain why there were inconsistencies between his direct testimony and his

hospital statement.  Ivie claims that counsel was deficient because the jury would have found Dr.

Ferrer more believable at trial.  Ivie contends that his hospital statement was unreliable because

of the trauma he recently experienced and the medications he was administered.  He contends

that Dr. Ferrer's testimony would have explained to the jury why his hospital statement was

unreliable, thereby rehabilitating his credibility.  In addressing these contentions, we focus on

whether counsel provided ineffective assistance in not contacting Dr. Ferrer or investigating his

potential testimony.

1. Failure to Investigate Dr. Ferrer's Potential Testimony was Deficient

As noted, the decision whether to call a particular witness is presumed to be a matter of

legitimate trial tactics.  *Davis*, 152 Wn.2d at 742.  However, this does not relieve an attorney of

the

> duty to make reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary.  In any ineffectiveness case, a particular

[2] Ivie argues that "[i]t appears that he was impeached no less than 13 times with statements he made at that hospital that differed from his trial direct examination."  Br. of Pet'r at 25.

decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691.

Dr. Ferrer declared that defense counsel did not contact him. Dr. Ferrer was Ivie's treating physician immediately after the shooting and was the primary source of information regarding Ivie's medical condition before he provided a recorded statement. Ivie was interviewed soon after sustaining serious gunshot wounds for which he had been given morphine. Defense counsel should have contacted Dr. Ferrer, at least to determine whether Ivie was capable of providing a knowing and voluntary waiver. *See Ray*, 116 Wn.2d at 548 ("Failure to investigate or interview witnesses, or to properly inform the court of the substance of their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest."). If defense counsel had done so, he would have been able to make an informed decision as to whether to call Dr. Ferrer at trial to neutralize the impeachment using Ivie's hospital statements. Accordingly, defense counsel was deficient.

2. Failure to Investigate Dr. Ferrer's Potential Testimony was Not Prejudicial

Ivie, however, does not show a reasonable probability that, but for counsel's failure to call Dr. Ferrer, the verdict would have been different. Ivie testified he was shot in the back. VRP at 592. He also testified that he was in pain and on morphine and OxyContin. VRP at 552. Dr. Ferrer's generalization that it is difficult to obtain information from a patient experiencing extreme pain and receiving morphine by itself has little application to Ivie's specific circumstances. Although defense counsel performed deficiently by neglecting to contact Dr. Ferrer to investigate whether Ivie was capable of providing a knowing and voluntary waiver, Dr.

25

Ferrer's declaration does not present any facts, beyond the noted generalizations, that call the knowing and voluntary nature of Ivie's waiver into question in the circumstances presented.

This evidence does not show a reasonable probability that the verdict would have differed had Dr. Ferrer's potential testimony been investigated. Thus, Ivie does not demonstrate that he was prejudiced.

Accordingly, this claim of ineffective assistance fails.

F.      Failure to Call Dr. Ferrer Regarding Location of Ivie's Gunshot Wounds

Ivie argues that his counsel's failure to obtain Dr. Ferrer's testimony was deficient and prejudiced him at trial because Dr. Ferrer would have provided evidence as to the location of his gunshot wounds. This, in Ivie's view, would challenge the State's version of the shooting. We disagree.

Ivie contends that because he was shot in the back, the jury could reasonably infer that Adams "was not . . . standing directly in front of the truck . . . but standing on the driver's side of the truck and fired after the truck had passed." Br. of Pet'r at 25. Adams testified that he would have been hit "dead center" and "squished or killed" if he did not take evasive actions. VRP at 315. He also testified, "I was surprised I didn't get hit. I was surprised that I was able to move across the bank fast enough to not get hit by the front of the truck. I didn't bother firing any rounds at that point because I would have hit nothing but grille." VRP at 320. Adams testified that he fired four rounds in the side of the truck and then an additional four rounds as the truck was moving past and away from him.

Dr. Ferrer was not at the scene, so he could not testify as to whether Ivie accelerated towards Adams. Similarly, he could not testify as to whether Adams took evasive actions to

26

avoid being struck. More to the point, any testimony by Dr. Ferrer that Ivie was shot in the back would be consistent with Adams' testimony that he fired the four final shots as Ivie was going past and away from him.

Therefore, defense counsel was not deficient in failing to call Dr. Ferrer to testify to the location of the wounds. Accordingly, this claim of ineffective assistance fails.

G.     Failure to Introduce Photographs of Ivie's Gunshot Wounds

Ivie argues that his counsel's failure to introduce photographs of his gunshot wounds was deficient and prejudiced him at trial. We disagree.

Ivie claims that introducing the photographs would have corroborated his story and discredited Adams' testimony. However, as discussed above, Adams testified that he fired his weapon from the side and rear of Ivie's truck. The State's testimony is relatively consistent with the location of Ivie's gunshot wounds, which presents a strategic reason for not introducing the photographs. Moreover, the photographs do not address the issue of whether Adams was in the path of Ivie's vehicle before he fired the shots. Hence, counsel was not deficient for not introducing photographs.

Therefore, this claim fails.

H.     Failure to Prepare Ivie to Testify

Ivie claims that defense counsel's failure to prepare him to testify was deficient and prejudiced him at trial. Assuming, without deciding, that counsel was deficient, we hold that Ivie does not show prejudice; that is, a reasonable probability that the verdict would have been different if he had been better prepared to respond to inconsistencies between his hospital statement and his trial testimony.

27

Ivie claims that "counsel never showed him a transcript or played him the recording of the statement he made" while he was at the hospital. Br. of Pet'r at 28. He supports this with his own declaration. Ivie argues that, as a result, "he was unprepared to respond to questions about discrepancies between his trial testimony and his hospital statement." Br. of Pet'r at 28. However, before Ivie testified, his hospital statement was the subject of a motion to exclude. At this hearing, an audio recording of his statement was played in court, and Ivie acknowledged that he listened to the recording.

Ivie's argument presupposes that he would have been better prepared to answer the prosecutor's questions on cross-examination if counsel had showed him a transcript or played him the recording of his hospital statements before he testified at trial. However, regardless of whether Ivie's trial testimony could have been clearer about his prior inconsistent statements, or whether his demeanor or credibility could have been improved with added preparation, Ivie does not claim that the substance of the testimony he provided under oath at trial would have been any different.

The purpose of Ivie's testimony, in part, was to undermine the reliability of his hospital statement by explaining that he was heavily medicated post-surgery thereby rendering him unable to provide coherent, credible information to the police investigators. Ivie provided positive testimony on those points when the prosecutor impeached him with prior inconsistent statements on cross-examination. He also provided contradictory testimony on cross-examination refuting parts of his hospital statement.

When asked about the discrepancy between his hospital statement and trial testimony regarding when he noticed that the police were tailing him with their lights on, Ivie clarified that

he testified inconsistently because he "was under the influence of morphine and OxyContin" at the hospital. VRP at 614. Even if counsel had prepared him better, the substance of Ivie's answer would still be the same—his hospital statements were unreliable because he was heavily medicated. That testimony supplied a reasonable explanation for any inconsistency in his memories of whether the lights were on. Hence, we see no prejudice in the allegedly deficient preparation.

When the prosecutor asked Ivie about when he noticed he was being chased by the police, when he saw the police vehicle lights, and why he failed to stop, he confirmed he made certain statements at the hospital, but stated, at trial, "that's not what I meant" and provided an alternative explanation. VRP at 625-29. Even with better preparation by counsel, the essence of Ivie's answer would in all probability remain the same: explaining that the prosecutor had misinterpreted his hospital statement and describing what was going through his mind at the time. Hence, the failure to prepare him did not result in prejudice.

The prosecutor impeached Ivie about his relationship with a neighbor and his awareness about her presence at the trailer where he attempted to turn his vehicle around. At the hospital, Ivie stated his neighbor lived there only during the summer. However, at trial, Ivie testified that "Cynthia comes up throughout the year" and "comes up once in awhile [sic] during the winter." VRP at 634-35. He said, "I was in hopes that there would be" someone at the trailer when he turned in that direction. VRP at 634. He clarified, "She just doesn't live up there. She – lives somewhere else – during the winter. There's a lot of people that come up once in awhile [sic]." VRP at 634-35.

29

Again, even if counsel had more thoroughly prepared Ivy, the substance of his answer would likely be the same: he did not know whether Cynthia was currently residing at the trailer, but hoped so. Also, there was no obvious inconsistency between Ivie's statement at the hospital that Cynthia lives there only during the summer and his trial testimony that she comes up throughout the year. We see no prejudice to Ivie from these statements.

The prosecutor impeached Ivie in his testimony about Adams' vehicle and his location. Ivie's hospital statement referred to the vehicle as a car. Ivie stated that when he came around, Adams had blocked the road again, and he was out of the vehicle. He also stated that he noticed the red and blue lights on the vehicle. At trial, however, Ivie testified he did not necessarily know if it was a car or truck, could not see Adams out of the vehicle, and did not notice any red and blue lights engaged on the vehicle at the time. As above, even if counsel had prepared him better, the substance of Ivie's answer, if truthful, would likely have been the same. More to the point, these minor inconsistencies were readily explained by Ivie's testimony about his condition at the hospital. We see no prejudice to Ivie from these statements.

The prosecutor impeached Ivie about his understanding of who owned the property where the maple tree was. At the hospital, Ivie stated, "[I]t's in the greenbelt; belongs to everybody in Cushman." 4 VRP at 642. At trial, Ivie testified that the property belonged to a man named John Spurrier. Ivie also explained at trial, however, that "[t]here's a greenbelt right next to John's property. And where the tree is, I believe it's on the greenbelt." 4 VRP at 642. Ivie does not explain how his answer would have differed if he had been better prepared. Also, his testimony about his condition at the hospital provided his best explanation for this minor discrepancy. We see no prejudice from these statements.

30

Ivie's post-trial declaration does not claim that he would have made different substantive statements at trial if he had been better prepared. Thus, additional pretrial preparation producing more comprehensive answers would likely have added little to the essence of his testimony. Ivie chose to testify at trial. His trial testimony would either be consistent or inconsistent with his hospital statement. Presuming Ivie's trial testimony was truthful, no amount of preparation would have changed Ivie's trial testimony to avoid inconsistency with his purportedly inaccurate hospital statement. Further, no amount of preparation would have precluded the State from impeaching Ivie with his prior inconsistent statements. Ivie has not shown a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. Accordingly, Ivie was not prejudiced by counsel's alleged failure to prepare him.

I. Failure to Object to State's Evidence and to Adequately Cross-Examine Witnesses

Ivie argues that his counsel's failure to object to Simper's testimony regarding the computer-based crime scene reconstruction was deficient and prejudiced him at trial. We disagree.

Ivie claims that defense counsel should have objected to Simper's testimony because the prosecutor did not lay a proper foundation for the testimony. In addition, Ivie argues that on cross-examination, "counsel asked no questions challenging the images, the measurements, or the accuracy of the bullet trajectories contained on the images." Br. of Pet'r at 30. Ivie argues that "[t]he Total Station diagrams and the State's demonstrative photographs with the colored rods were inaccurate and misleading as to the trajectory of the shots fired by Adams." Reply Br. of Pet'r at 12.

The State introduced several computer-generated images (i.e., Total Station diagrams) of the crime scene through the testimony of Simper. The images allegedly depicted the location of various items of evidence such as shell casings, Adams' vehicle, the path of Ivie's truck, and the trajectory of the bullets fired by Adams.

When the basis of an ineffective assistance argument is the failure to object to evidence, the appellant must show "(1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct; (2) that an objection to the evidence would likely have been sustained; and (3) that the result of the trial would have been different had the evidence not been admitted." *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998) (internal citations omitted). Ivie argues that the failure to object could not be a legitimate strategy or tactic because the evidence does not support his expert's theory regarding vehicle orientation and bullet trajectory.

However, defense counsel may have decided that an objection would draw attention to evidence that was inconsistent with his defense. In *State v. Gladden*, 116 Wn. App. 561, 568, 66 P.3d 1095 (2003), the court concluded that the failure to object was a legitimate trial tactic where counsel may have decided that an objection would draw attention to the information he sought to exclude. By not objecting to Simper's testimony, jurors were less likely to place undue weight on that evidence. Counsel may also have decided that Simper's testimony actually helped Ivie, because the bullet holes in the side of the car were inconsistent with the claim that Ivie drove straight at Adams. Ivie has not rebutted the presumption that the failure to object was the product of legitimate trial tactics or strategy.

Ivie also argues that "[d]uring cross-examination of Detective Simper, counsel asked no questions challenging the images, the measurements, or the accuracy of the bullet trajectories

contained on the images." Br. of Pet'r at 30. However, on cross-examination, when counsel

asked whether Simper could form an opinion about where Adams was standing when he fired at

Ivie's vehicle, Simper testified,

> [T]hat would be narrowed down to a specific area, just based on the position where those shell casings were located. However, to determine exactly where Sergeant Adams was at the time that each shot was fired would be . . . futile, just based on . . . several variables.

VRP at 251.

Thus, counsel's question was able to convey to the jury that determining Adams' exact

location would be an exercise in futility and, as such, questioned the accuracy of the total station

software. *Id*. Notwithstanding the fact that Ivie now claims he would have asked different (or

more) questions on cross-examination, shrewd arguments often look obvious in hindsight. As

the court stated in *Strickland*, 466 U.S. at 669,

> a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

We presume counsel was reasonable in his line of questioning because the manner of

cross-examination is generally a matter of judgment and strategy. *See Davis*, 152 Wn.2d at 720.

Ivie has not shown the contrary. Therefore, he has not established deficient performance, and his

claim fails.

J.      Failure to Contact Lay Witnesses (Churchill)

Ivie claims that defense counsel's failure to locate and interview lay witnesses to

corroborate his testimony was deficient and prejudiced his defense. Specifically, Ivie claims that

if counsel had performed an objectively reasonable investigation of lay witnesses he would have contacted Churchill, who claims Reed attempted to fabricate evidence against Ivie. We disagree.

To provide effective assistance, defense counsel must investigate the case, which includes investigation of witnesses. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). The duty to investigate does not necessarily require that every witness be interviewed, but defense counsel has an obligation to provide factual support for the defense where it is available. *Davis*, 152 Wn.2d at 739. "Failure to investigate or interview witnesses, or to properly inform the court of the substance of their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest." *Ray*, 116 Wn.2d at 548. Therefore, failure to interview a particular witness may constitute deficient performance. *Jones*, 183 Wn.2d at 340. Whether performance is deficient may hinge on the reason for such failure to interview. *Id.* Further, "[i]n evaluating prejudice, 'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" *Davis*, 152 Wn.2d at 739 (quoting *Rios v. Rocha*, 299 F.3d 796, 808-09 (Ninth Circ. 2002)).

Because the merits of Ivie's contentions could not be determined solely on the record before us, we remanded the petition for a reference hearing on this specific issue. At the reference hearing, Foley, Churchill, Doughty, and Reed testified. After the hearing, the superior court reviewed defense counsel's file and his billings that referenced Churchill. The superior court also accepted a stipulation of the parties that Marx, Ivie's girlfriend, was contacted by Doughty regarding Churchill.

In sum, the superior court found the following relevant facts: (1) Ivie advised defense counsel that Churchill was a potential witness, (2) defense counsel had knowledge that Churchill

was a potential witness and knowledge concerning the substance of his testimony, (3) defense counsel directed Doughty, his private investigator, to locate and/or contact Churchill, (4) Doughty attempted to locate and/or contact Churchill by phone and on-line searches, (5) the online search disclosed two possible addresses for Churchill, one in Shelton and one in Union, (6) Doughty investigated one possible address, where he contacted a woman who claimed she did not know where Churchill was, but the superior court's order does not discuss whether Doughty contacted the other address, (7) it is more probable than not that the attempts to find Churchill were limited to those testified to by Doughty, (8) defense counsel testified that he never contacted Churchill because he could not find him, (9) Churchill testified that Reed attempted to suborn false testimony from him for use in Ivie's trial, and (10) Reed testified that he has never asked a potential witness to testify falsely, including Churchill.

The record does not support Ivie's assertion that his counsel's performance fell below an objective standard of reasonableness. Instead, the record shows that defense counsel attempted to investigate Churchill's allegations, but his private investigator, Doughty, was unable to locate or contact him. *Cf. In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 355, 325 P.3d 142 (2014) (after defendant suggested defense counsel contact potential lay witness, counsel made numerous attempts to interview the lay witness, and even tried to subpoena her, but to no avail). Defense counsel's attempts to locate and/or contact Churchill through his private investigator were objectively reasonable. The inability to locate and/or contact a potential witness—after reasonable efforts have been made—does not constitute deficient performance. *See id*. at 355-56.

Furthermore, the facts suggest that defense counsel was generally aware of the facts and testimony Churchill would have provided to support Ivie's credibility argument against Reed. Counsel's choice not to develop this argument following the inability to locate and/or contact Churchill was similarly objectively reasonable. *See id*. at 355-56. Therefore, we do not address the prejudice prong of the *Strickland* test, and Ivie's claim fails.

K.     Failure to Present Adequate Closing Argument

Ivie claims that his counsel's failure to present an adequate closing argument including basic exculpatory facts was deficient and prejudiced him at trial. Specifically, Ivie claims that counsel's failure to address the location of his gunshot wounds and his physical and mental condition at the time he provided his hospital statement in closing was objectively unreasonable. We disagree.

There are many different ways to present a closing argument. Decisions about what to include (or exclude) in closing argument necessarily involves trial strategy and tactics. *Grier*, 171 Wn.2d at 33-34. During closing argument, defense counsel emphasized Ivie's testimony that it was dark outside, the officers were wearing black, he did not see Reed or Adams, and he did not intend to hit either of them with his vehicle. This was consistent with a legitimate defense strategy to bolster his client's testimony. Counsel may have had a strategic reason for not emphasizing the location of the gunshot wounds and his hospital statement. For example, the hospital statement had already been used to impeach Ivie's direct testimony, which counsel was trying to highlight in closing. Given the strong presumption that counsel's performance was effective, we hold that his closing argument was not deficient.

L.      Failure to Object to the State's Rebuttal Closing Argument

Ivie claims that defense counsel's failure to object to the prosecutor's rebuttal closing argument described in Part II., B. of the Analysis was deficient and prejudiced him at trial.

In Part II. B. and C., above, we concluded that the prosecutor's rebuttal closing was improper, but that it was not prosecutorial misconduct because it failed the heightened standard of *Emery*. It failed that standard, we concluded, for two separate reasons: a curative instruction would have obviated any prejudicial effect on the jury and the improper remarks did not have a substantial likelihood of affecting the jury verdict. The latter is the same standard for showing the prejudice necessary for ineffective assistance of counsel. Therefore, even if we assume that counsel's failure to object to the prosecutor's improper remarks was deficient, Ivie still has not shown the requisite prejudice for ineffective assistance of counsel. With that, this claim of ineffective assistance of counsel fails.

## IV. CUMULATIVE ERROR

Finally, Ivie argues that the cumulative effect of the errors he has identified deprived him of a fair trial. We disagree.

Under the cumulative error doctrine, a reviewing court may reverse a defendant's conviction when the combined effect of trial errors denied him a fair trial, even if each error alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Stated another way,

> [f]or relief based on the cumulative error doctrine, the defendant must show that while multiple trial errors, 'standing alone, might not be of sufficient gravity to constitute grounds for a new trial, the combined effect of the accumulation of errors most certainly requires a new trial.'"

*State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017) (quoting *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)). The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome. *Weber*, 159 Wn.2d at 279.

The case law offers some guidance as to how these abstractions are to be implemented. In *State v. Badda*, 63 Wn.2d 176, 183, 385 P.2d 859 (1963), the Supreme Court held that an accumulation of errors required a new trial. The errors included the failure to give the required precautionary instruction when one of two co-defendants confessed to the crime; the failure to give the required precautionary instruction when the case was submitted to the jury solely on uncorroborated accomplice testimony; and the failure to inform the jury that the verdict must be unanimous in the absence of adequate evidence the jury was polled. *State v. Alexander*, 64 Wn. App. 147, 158, 822 P.2d 1250 (1992), held that reversal was required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing. Finally, *State v. Whalon*, 1 Wn. App. 785, 804, 464 P.2d 730 (1970), reversed a conviction on the basis of (1) the court's severe rebuke of the defendant's attorney in the presence of the jury, (2) the court's denial of the testimony of the defendant's wife, and (3) the jury listening to a tape recording of a lineup in the absence of court and counsel.

In this decision we hold or assume that a number of Ivie's challenges show improper or deficient conduct, but that they fail for lack of prejudice. We summarize their effects below and examine whether their combined effect denied Ivie a fair trial.

First, we hold above that the failure to contact Dr. Ferrer or investigate his potential testimony about Ivie's condition at the hospital was deficient in two respects: it may have provided evidence that Ivie's waiver of the right to silence was not voluntary, and it may have better explained the inconsistencies between Ivie's hospital statement and his trial testimony. We recognize that Dr. Ferrer's testimony as reflected in his declaration would have helped Ivie to some degree in arguing an involuntary waiver or in repairing his credibility. Dr. Ferrer, though, did not testify about Ivie's condition individually. Rather, he opined that "it is frequently difficult to obtain information from a patient who is experiencing extreme pain and receiving morphine." Br. of Pet'r, App. 51-53, Decl. of Ferrer. Any benefit to Ivie from this opinion is limited by its generality. In addition, the description in Dr. Ferrer's declaration of Ivie's wounds, his reporting severe pain and his taking morphine was largely cumulative of Ivie's testimony.

Next is Ivie's claim that defense counsel did not inform him of the content of Ivie's statements at the hospital, which in turn impaired Ivie's ability to withstand cross-examination based on those statements. Part III. H., above, describes the specific instances in which Ivie was impeached with the hospital statements and Ivie's explanations of the inconsistencies. It also notes that Ivie's post-trial declaration does not claim that he would have made different substantive statements at trial if he had been better prepared.

Finally, we hold above that the impugning remarks in the State's rebuttal closing argument were improper, and we also assume that defense counsel's failure to object to them was deficient. The effect these actions may have had would lie in the jury's attitude toward defense counsel.

No. 49526-1-II

The State presented substantial evidence against Ivie. The impropriety and deficiencies just described, viewed individually, did not prejudice Ivie. Considering the nature and context of these actions, the substantial evidence against Ivie, and having reviewed the record, we cannot say that their combined effect deprived Ivie of a fair trial. This conclusion is supported by a comparison to the more serious errors that underlay the cumulative error in *Badda*, *Alexander*, *and Whalon*, noted above.

For these reasons, cumulative error does not warrant granting this petition.

CONCLUSION

Ivie's PRP is denied.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Worswick, J.

Maxa, C.J.

40