IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80489-8-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| LAZAR NACOMA CHAPMAN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — Lazar N. Chapman seeks reversal of his convictions for witness tampering and three counts of felony violation of a no contact order. He contends that the State failed to present sufficient evidence of the two alternative means of witness tampering and that the prosecutor committed reversible misconduct during closing argument when he referred to unadmitted evidence. Because the State presented sufficient evidence of both alternative means of committing witness tampering that were submitted to the jury and Chapman cannot show prejudice from the prosecutor's improper remark, we affirm.

FACTS

On February 18, 2019, Tukwila police officers responded to Laurie Porr's house at approximately 5:00 a.m. Porr was protected by a no-contact order restraining Lazar Chapman. One of the officers heard someone climbing over a metal fence, saw Chapman, and chased him. Chapman stated that he was at a

friend's house and his ex-girlfriend had threatened to call 911. Chapman's arrest was captured on the officer's body-worn camera. Porr gave a recorded statement to police and made a second recorded statement the following day.

Chapman was charged with residential burglary with a domestic violence designation. While he was in custody pending trial, he made several phone calls to Porr, which were recorded on the jail's phone system. In one call, Chapman told Porr that he was facing 36 to 48 months on a residential burglary charge and asked her what her "stance" was so that he could decide whether to accept a plea agreement or go to trial. The next day, he called her again and explained that the police thought he had broken into the house because of her statement that she had woken up on the couch and saw Chapman standing over her. Porr assured Chapman that she had written down that he did not take anything from the house or harm her. Chapman told Porr that they had to "play it safe" because of the no-contact order and said, "You're Robin." He began addressing her as "Robin" and referring to "Ms. Porr" in the third person. Chapman called Porr multiple times over the following week, urged her to come to his arraignment and say they had not had contact, and told her that if "nobody shows up" at trial, "there's a possibility it could get dismissed." He repeatedly told her he loved her and said, "[I]f you really do care about me, you love me like you fucking proclaim, this is where it's going to show."

Just before trial, the State amended the charging document to drop the burglary charge and instead charge three counts of felony violation of a court order—one alleging that Chapman had contacted Porr at her residence and two

based on the jail calls—and one count of tampering with a witness based on the jail calls. Each count was designated a domestic violence offense based on the State's allegation of a qualifying relationship between Chapman and Porr.

Chapman successfully moved to exclude Porr's recorded statements to police at trial, arguing that their admission would violate his right to confrontation because she was not testifying. Porr's written victim impact statement that she had returned to the prosecutor's office was admitted and shown to the jury. In that statement, Porr stated that she had not been assaulted, nothing was taken from her house, and she wanted no charges brought against Chapman.

At trial, the court admitted a no-contact order protecting Porr and restraining Chapman from contacting her in person or by phone and from coming within 500 feet of her residence. The State also produced two prior convictions for no-contact order violations within the past several years. An officer testified that he had reviewed Porr's recorded statements and listened to the jail calls and identified Porr's voice on the jail call recordings. He did not testify as to the content of Porr's statements.

During closing argument, the prosecutor argued that the jury should find that the female caller in the recorded jail calls was Porr based on the content of the calls, the fact that the phone number dialed by Chapman matched the number that Porr had submitted to the prosecutor's office, and the officer's testimony that he had spoken with Porr in person and recognized the female voice on the calls as Porr. Defense counsel suggested in closing that Porr's absence rendered the

State's evidence insufficient. In rebuttal, the prosecutor also addressed Porr's absence:

> [PROSECUTOR]: What did the State show you?
>
> It's evidence of that female's identity. It is evidence that the woman who picked up that phone and was speaking with Lazar Chapman was Laurie Porr. That is what the State proved to you.
>
> And I agree with [defense counsel] that it would be great if Ms. Porr was here in court. It would be great if you could listen to her testimony here in this court. It would be great if you could listen to her recorded statement with Officer Balcom the same—
>
> [DEFENSE COUNSEL]: Objection. Your Honor, I—I have a motion.
>
> THE COURT: We'll take it up at the end of arguments. Again, any arguments not supported by the evidence the jury can disregard. This is just argument. Go ahead, [counsel].
>
> [PROSECUTOR]: Ms. Porr is not here in this courtroom. Ms. Porr did not show up to testify. And the State has charged Mr. Chapman with tampering with a witness. Please find him guilty of that charge. Please find him guilty of the three cons—three—excuse me—three counts of felony violation of a No Contact Order. Thank you.

After the jury was excused, Chapman moved for a mistrial based on the prosecutor's reference to Porr's recorded statement to Officer Balcom that had not been admitted. The court denied the motion, noting that the prosecutor had moved on to a different line of argument and never completed the thought after defense counsel objected. The court also noted that it had instructed the jury to disregard any arguments not supported by the evidence and was satisfied that the jury would make a decision based solely on admitted evidence.

Chapman was convicted of all counts as charged. The court sentenced him to concurrent terms of 60 months confinement on each of the no-contact order violations and 51 months confinement on the witness tampering conviction.

- 4 -

Chapman was also ordered to have no contact with Porr for two years. He appealed.

ANALYSIS

I.    Sufficiency of the Evidence

Chapman argues that his conviction for tampering with a witness must be reversed because the evidence was insufficient to prove both alternative means of committing the crime.

Criminal defendants in Washington have the right to a unanimous jury verdict. WASH. CONST. art. I, § 21. When the defendant is charged with an alternative means crime, this right may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime. State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). If there is sufficient evidence to support each of the alternative means of committing the crime on which the jury is instructed, express jury unanimity as to the means is not required. Id. However, if the evidence is insufficient to support any means, a particularized expression of jury unanimity is required. Id.

We review the sufficiency of evidence to support a conviction de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient if, viewed in the light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). An appellant claiming that the evidence was insufficient "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id. Circumstantial and direct

evidence are equally reliable in determining sufficiency of the evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). An appellate court "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874–75, 83 P.3d 970 (2004).

Witness tampering is an alternative means crime. State v. Lobe, 140 Wn. App. 897, 902, 167 P.3d 627 (2007). A person may commit the crime of witness tampering by three alternative means: attempting to induce a person to (1) testify falsely or withhold testimony, (2) absent themselves from an official proceeding, or (3) withhold information from a law enforcement agency. RCW 9A.72.120(1); Lobe, 140 Wn. App. at 902–03. When evaluating a charge of witness tampering, jurors are "required to consider the inferential meaning as well as the literal meaning" of a defendant's words to the witness because "[t]he literal meaning of words is not necessarily the intended communication." State v. Scherck, 9 Wn. App. 792, 794, 514 P.2d 1393 (1973).

Chapman was charged on the alternatives of attempting to induce a person to testify falsely and absent themselves. The jury was instructed on these two means only and was not instructed to give a particularized expression of unanimity as to which means Chapman employed. Therefore, to sustain the conviction, each of these two alternative means must be supported by sufficient evidence.

We first consider whether there was sufficient evidence that Chapman attempted to induce a person to testify falsely. Throughout the calls, Chapman

referred to Porr on the phone as "Robin" in an effort to circumvent the no-contact order:

> MR. CHAPMAN: (Indecipherable) Okay. Well you're Robin, you're Robin, you hear me?
>
> FEMALE VOICE: Yeah, why's that?
>
> MR. CHAPMAN: Because when I pled guilty, Robin, to a violation of a Protection Order on March 26th of 2018, they re-instilled a fucking Protection Order until 2020.

In another call, Chapman recommended that Porr change the name in her phone to reflect the alias:

> You know how when you set up your phone you can put (indecipherable) you put your name and everything in?
> . . .
> I would highly recommend, Robin, that—that you just to clarify that your phone definitely says Robin Vetkos or whatever on—in your phone. 'Cause it's not going to alter or change anything uh other—otherwise, (indecipherable) if it would be looked at through an IT technician, for instance, then this way they can verify—
> . . .
> that it is Robin Vetkos, you know.
> . . .
> You just have to—to see and look because then this way—otherwise as it stands, you know what I mean, you're Robin Vetkos, you know what I mean?
> . . .
> And it's like this way nothing can be misconstrued. And because otherwise the—this way—this way (indecipherable) were to be asked (indecipherable) 'cause there will be something that comes all together and something entirely different, you know what I mean?
> . . .
> So (indecipherable) they're going to have a hard time proving somebody is talking to somebody, you know what I mean? Like they could like, oh, yeah—
> . . .
> —we think you were involved but then they're going to have to like—they got subpoena you to come to court or whatever, to—only—only have you (indecipherable) to say anything. So how you going to fucking prove who you're talking to? I mean that would really look fucking stupid in a—

. . .

—in a jury—or in a trial.

As part of this subterfuge, Chapman frequently talked about Porr in the third person while addressing her as "Robin." When talking to Porr about his arraignment, Chapman implied that he wanted her to appear and request that the no-contact order be dropped:

> I'm hoping maybe that if—if I get lucky and the lady comes to my arraignment on March 5th and says hey, you know,—and swears up and down that she doesn't want a fucking—you know, this, that and the other shit—she doesn't want that and I—I mean like literally, she's going to have to fight for me. If she wants me to have—if she wants me—you know—you know, if she doesn't want to spend the next fucking year to two years away from me, or maybe longer, yeah, she—there's going to have to be some serious motherfucking— some serious fight on her behalf, you know.
>
> And when I can't even ask nobody to talk or nothing, because that's a violation of, you know. So like I have to sit back and just hope and wonder[.]
> . . .
> I'm hoping to God that fucking somehow or other—something—a miracle can come and—and then if she's there on—on the 5th—on the arraignment day saying that she doesn't want this no contact thing, and she doesn't want that, if she's able to do all that, then maybe, just maybe—'cause right now that's kind of—kind of where we stand—where I stand with this lady.

Chapman stated that, if the no-contact order was lifted, "at least I'll be able to talk without fear of throwing more of my life away," indicating his awareness that he was violating the no-contact order by talking to Porr. He then implied that Porr should deny that Chapman had been contacting her:

> And my attorney told me not to say anything on the phone, and not to say anything—not to drop no names or nothing. But as it stands, phone numbers shit, you know what I mean? So—
> . . .
> But—but the one thing that I got going on is that as long as she's saying—you know what I'm saying? If she's saying that we're not

- 8 -

talking, then we're not talking, you know what I mean? Like (indecipherable) . . . Yeah, so—
. . .
—(indecipherable) then (indecipherable) keep it simple, stupid, you know what I mean? No intricate lies and none of that bullshit, you know what I mean? Like just keep it simple, stupid, but true. Keep it simple, stupid. No, we're not, and no we haven't been, and I don't know—you know what I'm saying? And fucking—and lah de dah.

Although Chapman emphasizes in his argument that he was not attempting to induce false testimony because he was urging Porr to "keep it simple . . . but true," the State accurately points out that he was suggesting that Porr say that they had not been talking while they were in the process of talking. The inferential meaning of Chapman's statement differs from the literal words he used. As a whole, Chapman's statements conveyed the impression that he wanted Porr to appear at his arraignment and tell the court, untruthfully, that she and Chapman had not been in contact. A rational trier of fact could conclude that the inferential meaning of Chapman's words was an attempt to induce Porr to testify falsely.

We next turn to the sufficiency of the evidence that Chapman attempted to induce a person to absent themselves from an official proceeding. Although Chapman encouraged Porr to appear at the arraignment, he made repeated references to his increased chances at trial if witnesses were to fail to appear:

So I mean I still got half a mind to where if I should take this to the box, that I might be able to beat it if nobody shows up.
. . .
So if I were going to take it to trial or whatever, right, and fucking nobody shows up, there's a possibility it could get dismissed. But at the same time it won't, because they're going to dredge up all my fucking phone conversations. And there's only one number I've been fucking calling. And there's only one number that was put on this sheet when the original No Contact Order was put into place. You— can you follow what I'm saying?

Again, viewed in the light most favorable to the State, the inferential meaning of these remarks differs from the literal meaning. A rational trier of fact could conclude that Chapman was attempting to induce Porr to absent herself from the trial and refrain from testifying.

Because both alternative means of committing witness tampering that were presented to the jury are supported by substantial evidence, Chapman has not shown a violation of his right to a unanimous jury verdict.

II.    Prosecutorial Misconduct

Chapman also contends that the prosecutor committed misconduct during closing argument by referring to the unadmitted evidence of Porr's recorded statement. A defendant claiming prosecutorial misconduct bears the burden to prove that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). The State acknowledges that it is inappropriate to call the jury's attention to matters outside the record and concedes that the prosecutor's comment was improper. See State v. Belgarde, 110 Wn.2d 504, 508, 755 P.2d 174 (1988). If, as here, a defendant timely objected to the prosecutor's improper conduct at trial, they must show that the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760.

When the defendant objects or moves for a mistrial based on alleged prosecutorial misconduct, we give deference to the trial court's ruling on the matter because "'[t]he trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.'" State v.

Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997) (quoting State v. Luvene, 127 Wn.2d 690, 701, 903 P.2d 960 (1995)). We review the trial court's ruling for an abuse of discretion. Id. at 718.

"In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940, 945 (2008). A prosecutor's improper remark may be curable by a proper instruction even if it "touch[es] on a constitutional right." State v. Smith, 144 Wn.2d 665, 679, 30 P.3d 1245 (2001). We presume that juries are able to follow the court's instructions. Warren, 165 Wn.2d at 28.

In State v. Warren, the Washington Supreme Court considered a claim of prosecutorial misconduct based on the prosecutor's argument, referenced three times in closing, that "reasonable doubt does not mean beyond all doubt and it doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt." Id. at 25, 27. The court found that the prosecutor's conduct was "clearly improper" because it undermined the presumption of innocence. Id. at 24, 26. However, in context, the court concluded that any error was cured because defense counsel promptly objected to each statement and the trial judge "interrupted the prosecutor's argument to give a correct and thorough curative instruction." Id. at 28. The court also found that the prosecutor's improper reference in closing to facts not in evidence was not prejudicial when the court had instructed the jury "that counsel's arguments are not evidence." Id. at 29.

Chapman argues that the prosecutor's improper comment "led the jury to believe that he had knowledge of statements that he 'wished' he could share with the jurors but that he was being blocked from doing so" by the exclusion of the statements in accordance with Chapman's right to confrontation. He contends that the prosecutor's reference to Porr's recorded statement "made clear to the jury that her two recorded statements, carefully taken by Officer Balcom, would have provided evidence helpful to the State." However, the prosecutor's argument immediately preceding the improper reference concerned the bases proposed by the State for identifying the female caller as Porr. In context, the improper comment implied that listening to the unadmitted recorded statement would help the jury identify the female caller as Porr. This argument did not concern the content of recording, but rather the sound of Porr's voice.

Here, defense counsel's immediate objection and the court's reminder to disregard arguments not supported by the evidence were sufficient to cure any prejudice resulting from the improper remark. The reference to Porr's unadmitted statement was brief and unlikely to mislead the jury. Chapman has not shown that the State's misconduct had a substantial likelihood of affecting the verdict, and the court did not abuse its discretion in denying his motion for a mistrial.

Affirmed.

WE CONCUR: